KINGSTON ASSOCIATES, INC., Plaintiff, *v.* FIORELLO H. LAGUARDIA and Another, Defendants.

Supreme Court, New York County, July 1, 1935.

*Bennett E. Aron,* for the plaintiff.

*Paul Windels, Corporation Counsel* [*Paul Windels, Paxton Blair, Seymour B. Quel* and *Milton I. Newman* of counsel], for the defendants.

COTILLO, J. This is a taxpayer's action, pursuant to section 51 of the General Municipal Law, to restrain the comptroller of the city of New York from paying any money to the defendant Fiorello H. LaGuardia as salary for the office of mayor of the city of New York. A motion by the plaintiff for an injunction during the pendency of the action and a cross-motion by the defendants to dismiss the complaint for failure to state a good cause of action are presented to the court for determination.

The ground of plaintiff's motion is that defendant LaGuardia, by accepting a Federal office during his term as mayor of the city of New York, has automatically forfeited the latter office, by virtue of the provisions of section 1549 of the Greater New York Charter. As the answering affidavit denies that his activity under the Federal designation constitutes the holding of an office, it is appropriate to consider the act of Congress known as the Emergency Relief Appropriation Act (Public Resolution No. 11, 74th Congress), approved April 8, 1935, which is alleged to have created the office, by the acceptance of which the mayor of New York is said, as a matter of law, to have abandoned his municipal office.

That act appropriated the sum of $4,800,000,000 for the financing of work projects to reduce unemployment. Section 4 of that act provides that " in carrying out the provisions of this joint resolution the President is authorized to establish and prescribe the duties and functions of necessary agencies within the Government."

On or about May 6, 1935, pursuant to the authority thus vested in him, the President of the United States of America issued an executive order (No. 7034) establishing within the government certain agencies and prescribing their respective functions and duties.

The agencies thus created were:

(A) The Division of Applications and Information of the National Emergency Council to be under the general supervision of the Executive Director of the National Emergency Council, to receive applications for allotment.

(B) The Advisory Committee on Allotments (acceptance of membership in which by defendant LaGuardia is the gravamen of plaintiff's action).

(C) "A Works Progress Administration, which shall be responsible to the President for the honest, efficient, speedy, and coordinated execution of the work relief program as a whole, and for the execution of that program in such manner as to move from the relief rolls to work on such projects or in private employment the maximum number of persons in the shortest time possible."

The Advisory Committee was to be composed of the Secretary of the Interior, chairman; the Secretary of Agriculture; the Secretary of Labor; the Executive Director of the National Emergency Council; the Administrator of the Works Progress Administration; the Director of Procurement; the Director of the Bureau of the Budget; the Chief of Engineers, United States Army; the Commissioner of Reclamation; the Director of Soil Erosion; the Chief of the Forest Service; the Director of Emergency Conservation Work; the Chief of the Bureau of Public Roads; the Administrator of the Resettlement Administration; the Administrator of the Rural Electrification Administration; the Federal Emergency Relief Administrator; the Director, Housing Division; the Vice-Chairman, National Resources Board; and a representative of (a) the Business Advisory Council; (b) organized labor; (c) farm organizations; (d) the American Bankers' Association, and (e) the United States Conference of Mayors.

The executive order defined the functions and duties of the Advisory Committee as follows: " Such Committee shall make recommendations to the President with respect to the allotments of funds for such projects covered by the applications submitted by the Division of Applications and Information as will constitute a coordinated and balanced program of work under the said Act."

The plaintiff claims that on or about May 7, 1935, the defendant Fiorello H. LaGuardia, the mayor of the city of New York, was duly designated and appointed by the President as a member of the Advisory Committee on Allotments, to represent the United States Conference of Mayors. The defendant LaGuardia admits that on May 4, 1935, he received a telegram from Secretary of the Interior Harold L. Ickes, stating that the President had designated him as a member of the Advisory Committee on Allotments; he denies, however, that he received a formal written appointment from the President.

Section 1549 of the Greater New York Charter, which is the basis for plaintiff's charges that acceptance of membership on the Advisory Committee resulted in LaGuardia's automatic forfeiture of the office of mayor, reads as follows: "Any person holding office, whether by election or appointment, who shall, during his term of office, accept, hold, or retain any other civil office of honor, trust, or emolument

under the government of the United States  *  *  *, or of the state  *  *  *, or who shall hold or accept any other office connected with the government of the city of New York, or who shall accept a seat in the legislature, shall be deemed thereby to have vacated any office held by him under the city government."

If membership in the Advisory Committee on Allotments constitutes the holding of a " civil office of honor, trust, or emolument under the government of the United States," it is clear that the office of mayor of the city of New York has become vacant, it being well settled that the provisions of section 1549 are self-executing. (*Matter of Hulbert* v. *Craig*, 124 Misc. 273, 277; affd., 213 App. Div. 865.) In that case the court said (pp. 276, 277): " But the drastic mandate of the Greater New York charter, section 1549, permits the court to be affected by no such considerations. It reserved for the city the undivided public service of its officers. It is self-executing. When an officer transgresses its provisions, he ' shall be deemed thereby to have vacated ' his city office."

In *People ex rel. Kelly* v. *Common Council* (77 N. Y. 503), involving a similar provision of the charter of the city of Brooklyn, the court said (p. 510): " The moment he accepted the new office the old became vacant. His acceptance of the one was an absolute determination of his right to the other, and left him ' no shadow of title, so that neither *quo warranto* nor a motion was necessary.' *  *  * The office was and is as vacant as if Mr. O'Reilly had never been born; his removal is as complete as if caused by death. When he accepted the new office the other ceased to have an incumbent."

The provisions of section 1549 are most rigid. If the outside duties accepted by a municipal official are those of a public office, they result in the forfeiture of the first office. It matters not that no emolument is attached to the second office, or that the acceptance of the latter involves an exhibition of a high public spirit and personal sacrifice. An extreme illustration of this is the case of *Matter of Hulbert* v. *Craig* (*supra*). On the other hand, the very severity of the statute requires a strict interpretation, and a limitation of it to acceptance of a second public office as distinguished from other kinds of employment. The object of the statute is thus stated in *Davenport* v. *Mayor* (2 T. & C. 536; affd., 67 N. Y. 456): " The evident object and intent of the provision of the charter cited was to have the entire service of all of its officers and to prevent abuses which had grown up in consequence of a divided duty, which interfered with the performance of that duty by city officials. In carrying out this intent, the charter made the sweeping provision it does, its framers being unwilling to open the door to any exceptions."

The *Hulbert* case, too, as we have seen, refers to the motive of insuring undivided public service. It is interesting to note, however, that the fact that the second public office carries only nominal duties and no compensation has been held to be immaterial. And conversely, where the second employment does not fall within the category of public office, even though it carries remuneration, it does not fall under the ban of section 1549. The mandate of the charter is not directed at office holders of the city who devote part of their time to governmental or private services having no relation to the duties of their office, where the services are those of an employee. Subsequent references in this opinion will illustrate such instances. It affects only those who attempt to hold two *civil offices* at the same time. In *Matter of Gelson* v. *Berry* (233 App. Div. 20; affd., 257 N. Y. 551) the Appellate Division, Second Department, rejected the contention that an assistant corporation counsel of the city of New York had vacated her office by accepting a teaching position in the board of education in the following language (p. 21): " This argument is fundamentally unsound, for it is well established by authority that a teacher is not a public officer, but is only an employee of the board of education. \* \* \* When petitioner was reinstated as teacher she did not thereby hold or accept any other city office." There are numerous other cases to the same effect. No case to the contrary has been called to the court's attention. The title of the statute, " Officer not to hold any other civil office," as well as its very terms, indicate that it was intended to apply only to the holding of dual offices, and not to the mere rendition by an office holder of services not belonging to the category of public office.

Is membership on the Advisory Committee on Allotments a civil office under the government of the United States, within the contemplation of section 1549 of the charter? " The line between a public office and public employment has not been too clearly marked by judicial expression, probably because the distinction is not too clear. The holder of a public office is in the employment of the public, but all those who are in the public employment are not public officials and do not hold public office." (*Matter of Dawson* v. *Knox*, 231 App. Div. 490.)

Although public officers are usually required by law to take the oath of office, and this fact goes far in determining the character of the duty, " the taking of the oath is not an indispensable criterion and the office may exist without it, for \* \* \* the oath is a mere incident and constitutes no part of the office." (Mechem Public Officers, § 6; 46 C. J. 931.) Likewise, the right or absence of the right to receive salary, although entitled to considerable

weight (*People ex rel. Henry* v. *Nostrand,* 46 N. Y. 375, 381), is not determinative of the character of the position as an office. (Mechem, *supra,* § 7; 46 C. J. 931.) This is particularly true in the instant case, in view of the fact that section 1549 of the charter is expressly directed at an office holder who accepts any other civil office " of *honor, trust,* or emolument." (Italics mine.) Similarly, although " office " has been often said to embrace the idea of tenure and duration ( *United States* v. *Hartwell,* 6 Wall. 385, 393; *United States* v. *Germaine,* 99 U. S. 508, 511, 512; *People* v. *Duane,* 121 N. Y. 367, 375; *Matter of Hathaway,* 71 id. 238, 243; *Olmstead* v. *Mayor,* 42 N. Y. Super. Ct. 481), it does not necessarily follow that the absence of a definite term precludes a position or employment from constituting an office. (Mechem, *supra,* § 8; 46 C. J. 929.)

There is, however, one indispensable attribute of public office, namely, the right to exercise some portion of the sovereign power. " Public office " has been defined by Mechem in his work on " Public Officers," previously referred to (pp. 1, 2), as " the right, authority, and duty, created and conferred by law, by which for a given period, either fixed by law or enduring at the pleasure of the creating power, an individual is invested with some portion of the sovereign functions of the government, to be exercised by him for the benefit of the public." The author quotes with approval (p. 4) the following language of the judges of the Supreme Court of Maine in *Opinion of Judges* (3 Greenl. [Me.] 481): " We apprehend that the term ' office ' implies a delegation of a portion of the sovereign power to, and the possession of it by the person filling the office; * * *. The power thus delegated and possessed may be a portion belonging sometimes to one of the three great departments, and sometimes to another; still it is a legal power which may be rightfully exercised, and in its effects it will bind the rights of others, and be subject to revision and correction only according to the standing laws of the State. An employment merely has none of these distinguishing features."

In *Matter of Dawson* v. *Knox* (*supra*) the same thought was expressed by the Appellate Division, Third Department (p. 492): " The duties of a public official involve some exercise of sovereign power — those of a public employee do not."

In *People ex rel. Hoefle* v. *Cahill* (188 N. Y. 489, at p. 494) the Court of Appeals quoted with approval the following language of the Appellate Division in *People ex rel. Corkhill* v. *McAdoo* (98 App. Div. 312): " The essential element in a public office is that the duties to be performed shall involve the exercise of some portion of the sovereign power, whether great or small."

The mere fact that the Advisory Committee is designated an agency is not so decisive as to place it in the category of public office, unless the agency exercises some measure of sovereign power. This is well illustrated in the comprehensive definition found in *State ex rel. Zevely* v. *Hackmann* (300 Mo. 59): "In the most general and comprehensive sense a 'public office' is an agency for the State and a person whose duty it is to perform this agency is a 'public officer.' Stated more definitely, a 'public office' is a charge or trust conferred by public authority for a public purpose, the duties of which involve in their performance the exercise of some portion of sovereign power, whether great or small."

The following are illustrations of cases in which service was held not to be that of public office, either because it was ministerial, or merely advisory:

In *Fisher* v. *City of Mechanicville* (225 N. Y. 210) it was held that the village attorney, appointed by the board of trustees of the village of Mechanicville, pursuant to the act incorporating the village, did not hold a public office, the court emphasizing the fact (p. 214) that no provision was made in the act requiring the village attorney to take an oath of office and also that "*the fact is found that he does not perform any governmental duties.*" (Italics mine.) In *Matter of Dawson* v. *Knox* (*supra*) a county attorney appointed by the board of supervisors of Albany county pursuant to statute, for a term of two years, unless sooner removed, was held to be a public employee and not a public officer because, although the board of supervisors "unquestionably did exercise sovereign power," the attorney, in giving them counsel and legal advice, "exercised no sovereign power" (p. 492). In that case the court suggested that the status of a lawyer was no different from that of a consulting engineer or architect. In giving advice he did not exercise independent government power. In *People ex rel. Hoefle* v. *Cahill* (*supra*) a clerk appointed by the coroner was held not to be a public officer because the statute authorizing the appointment did not (p. 493) "assign any original, independent or governmental duties to the position of clerk thus created. * * * There is entirely lacking any suggestion of those powers and responsibilities and of that independent action upon the part of one of these clerks which are inevitably incidental to a public office." In *People ex rel. Corkhill* v. *McAdoo* (*supra*) a similar holding was made with reference to the position of complaint clerk in the police department, for the reason that he was (p. 314) "merely doing the detail work of the officer who is exercising the sovereign powers delegated to him by law," and was himself "with no authority under the statute to do anything except where it is authorized and directed by such officer."

Clearly, the members of the Advisory Committee on Allotments possess none of the powers of the sovereign. They perform no independent governmental function. Such function in general is either legislative, judicial or executive. It is too plain to require discussion that the Advisory Committee exercises no legislative or judicial prerogatives. It appears to be fairly evident that it likewise possesses no powers of the executive. Under the executive order of the President which created the Advisory Committee on Allotments, its functions and duties are confined to the making of " recommendations to the President with respect to the allotments of funds " for " projects covered by the applications submitted by the Division of Applications and Information." The right to recommend amounts to nothing more than the right to advise. The President may accept or reject the recommendations. The making of recommendations does not constitute the exercise of an executive function, any more than did the furnishing of legal advice and counsel in *Matter of Dawson* v. *Knox (supra)* and *Fisher* v. *City of Mechanicville (supra)*. The committee's status is merely that of an adviser to the executive. It is the president, and not the committee, who exercises the duties and powers of the executive. The committee has no power or authority of its own to make any allotments of funds. In the language of the answering affidavit of the mayor, the committee " is merely a consultative group of public officials all of whom are designated by virtue of the office which they occupy or groups with which they are associated." The committee thus lacks the most important characteristic or attribute associated with the idea of public office, namely, the right to exercise some part of the power of the sovereign.

A close examination of the language of the executive order mentioned, which defines the functions of the three main agencies created, of which the Advisory Committee is the second one enumerated, tends to confirm this view. It is particularly so when the functions of this so-called agency are contrasted with those of the other two. The Division of Application and Information of the National Emergency Council is intended to be an independent executive agency under the general supervision of the executive director of the council. It examines and reviews applications, obtains the aid of other governmental agents, and furnishes information to the public on the status of allotments and the progress of projects. The language creating it indicates that it was intended to be an administrative division. The same is true even in a greater degree of the Works Progress Administration, which is given *responsibility* for the execution of the work relief program. Both these divisions seem to fall within the test of public office as the

exercise of independent governmental power or discretion. The Advisory Committee, on the other hand, specifically is without executive power. Its function is to aid coordination by construc-tive criticism and advice. An analysis of its make-up in itself indicates its purpose. It is composed of the heads of agencies which direct the various types of Federal governmental activities which promote industrial and agricultural progress. It also includes representatives of the different groups of industrial society, including capital, labor, agriculture and commerce. Finally, it includes a representative of city government, for the reason that a great part of the work of public employment relief involves allot-ments for municipal work, intended to relieve unemployment suffering in the urban centers of population. The committee is, therefore, made up entirely of members *ex officio;* that is to say, by reason of the leading positions which these representative men occupy in the Federal government, in business, finance, organized labor, agriculture, or municipal government, they are found an ideal group to act as an advisory committee to make critical recom-mendations to the President for final action.

The defendant LaGuardia, as a representative of the United States Conference of Mayors, is the representative of municipal government. In selecting him, the President must have had in mind both the prominence and ability of the designee and his position as mayor of a city, which represents probably one-tenth of the urban population of the country. His presence on the com-mittee is to guard or measure the allowance for municipal projects of a due proportion of the appropriation of nearly $5,000,000,000. Who is in a better position to advise on municipal allotments and the character of public works, which will serve the true purpose of the Emergency Relief Act, than the mayor of the largest munici-pality in the country? If the designation by the President of a representative of municipal affairs had been made with an eye to the restriction of section 1549 of the charter, it would have been necessary for him to designate somebody who held no public office. This would have seriously hampered the usefulness of the Advisory Committee, because only a person in current touch with municipal needs and activities could most efficiently represent city affairs on such committee. That involves the selection of an office holder, who, if service on it is technically the holding of public office, could not accept without forfeiting his municipal office. It could never have been intended that such a ludicrous impasse should be created.

The very language of chapter 585 of the Laws of 1935 reveals the attitude of the Legislature on this point. It specifically indi-cates that all provisions of any general, special or local law, which

tend to prevent, hamper or delay municipalities, or to prevent, hamper or delay public bodies from taking advantage of the provisions of the Emergency Relief Appropriation Act, shall be inoperative. While it may not be said to repeal the provisions of section 1549 of the charter, it nevertheless is an authoritative mandate so to interpret it in the public emergency as not to prevent or hamper municipalities from taking advantage of the Emergency Relief Appropriation Act. Any construction which would compel the President to exclude the holder of a public municipal office from membership on the Advisory Committee and to limit his selection to one who is not in active touch with current municipal affairs, would result in hampering the progress of the Emergency Relief Appropriation Act in its application to municipalities. Such an effect is contrary to specific legislative intent as expressed in chapter 589, Laws of 1935, just referred to.

Other indicia of public office which, though not in themselves decisive or conclusive, are nevertheless generally present in the case of public officers and, therefore, entitled to great weight, are likewise absent here. No oath of office is prescribed for members of the Advisory Committee on Allotments and none was taken, subscribed or filed by the mayor as a member of that committee. As previously observed, the Court of Appeals attached a good deal of importance to the absence of a statutory requirement that an oath of office be taken. "No provision is made in the act requiring the village attorney to take an oath of office." (*Fisher* v. *City of Mechanicville, supra*, p. 214.)

In *Matter of Dawson* v. *Knox* (*supra*) the same circumstance was emphasized (p. 492): "Whether or not an official oath is required is sometimes considered in determining whether an incumbent is an employee or an official." The fact that no oath of office was required of the mayor or taken by him assumes added significance in the light of the existence of a Federal statute requiring an oath of office "to be taken by any person elected or appointed to any office of honor or profit either in the civil, military, or naval service, except the President of the United States." (U. S. Code, tit. 5, § 16.) The members of the Advisory Committee on Allotments are entitled to receive no salary for their services, a circumstance which must be given some consideration, in view of the numerous cases holding that the concept of office "embraces the ideas of tenure, duration, *emoluments* and duties." (*People* v. *Duane, supra*, p. 375, and cases cited.) Furthermore, no definite term of office is prescribed for the members of the Advisory Committee and there is, therefore, no semblance of the tenure usually included in the judicial definitions of "public office." Mention

might also be made here of the fact that though formal appointments of government officers are required to be accompanied by the issuance of a commission by the President, bearing the governmental seal (U. S. Code, tit. 4, § 5), no such commission was issued to Mayor LaGuardia. His only notice of the alleged appointment consisted of a telegram from Secretary Ickes, informing him that he had been designated by the President.

In the light of the foregoing, it is difficult to find any substantial legal basis for the plaintiff's claim that Mayor LaGuardia's acceptance of membership on the Advisory Committee on Allotments constituted the taking of a civil office under the government of the United States. The authorities relied on by the plaintiff are clearly distinguishable, and are not even remotely in point here. In *Matter of Hulbert* v. *Craig* (*supra*) the president of the board of aldermen of the city of New York had accepted an appointment by the Governor, with the advice and consent of the Senate, as a member of Finger Lakes State Parks Commission. He filed the required oath of office. The Commission clearly had governmental powers. It had the right to acquire parks, to maintain and control real and personal property and to devote the net income to park purposes. It possessed the power of eminent domain and had control of State appropriations. In *Davenport* v. *Mayor of New York* (67 N. Y. 456) a municipal commissioner had become Chief Supervisor of Elections, a place created by an act of Congress. The act prescribed his duties, as well as his emoluments. He possessed extensive powers with respect to the conduct of elections, under the terms of the act creating the office. The act further prescribed the taking of an oath of office. In *People ex rel. Kelly* v. *Common Council of Brooklyn* (*supra*) an alderman of the former city of Brooklyn had accepted election as a Representative in Congress. As such he, of course, was authorized to participate in the enactment of legislation, a governmental function. It is unnecessary to discuss in detail all the other cases cited by the plaintiff, for none of them involves a situation at all comparable to that presented for determination in the instant action. In no case that has been called to the court's attention has a person whose authority is restricted to the mere giving of advice and the making of recommendations been held to be an occupant of public office.

Plaintiff has laid great stress upon the fact that service on the committee will lead to neglect by the defendant of his duties as mayor. Reference is made to the wide and perhaps indiscreet publicity given to the plans of the mayor to spend one or two days a week in Washington and to the fact that permanent headquarters for him had been rented in that city. Even assuming this pub-

licity to be an accurate representation of fact, it is nevertheless utterly irrelevant to the issues in the case. The question is whether the mayor has *ipso facto* forfeited his office by acceptance of another *public office* within the purview of section 1549. Neglect of duty, no matter how serious, cannot have this result. It may be made the basis of charges before the Governor, and if proved, lead to his removal. It cannot, however, be construed as automatic resignation of his office, unless he has actually assumed another public office.

It is unfortunate that the mayor's acceptance of his designation by the President has even in a small measure jeopardized his right to continue to hold office as mayor of the city of New York. In the great public emergency, local as well as national, in which we all now find ourselves, it was the mayor's patriotic duty to aid the head of our government in any way which the latter, in his own discretion, might deem advisable. Moreover, the mayor's participation in the meetings and recommendations of the Advisory Committee would unquestionably tend to assist and benefit the city of New York, as well as other municipalities and the public generally. Regardless of whether or not chapter 782 of the Laws of 1933, as amended by chapter 585 of the Laws of 1935, is held to suspend the provisions of section 1549 of the charter, in so far as these provisions might otherwise apply, it is evident that the spirit and general purpose of these statutes are to encourage and promote the fullest possible participation by public officials throughout the state in all Federal projects initiated under the Works Relief Bill. A holding that the public-spirited conduct of the mayor, in accepting non-remunerative membership on the Advisory Committee on Allotments, deprived him of his office as mayor, is one which should be reached, if at all, only with the greatest reluctance, and solely because the clear wording of the statute permits of no other determination. No such state of affairs exists here. Membership on the Advisory Committee on Allotments may not reasonably be said to constitute the holding of a civil office under the government of the United States.

I have indicated my conclusion to the effect that the motion for an injunction must be denied. There remains for disposition the cross-motion to dismiss the complaint. One of the grounds of that motion is that this action involves the test of title to the office of mayor, an issue which may be determined only in an action of quo warranto. This objection is not well taken. The action is properly brought as a taxpayer's action on the theory enunciated by the Court of Appeals in *People ex rel. Kelly* v. *Common Council* (*supra*, 510, 512), part of which has previously been quoted. " The

office was and is as vacant as if Mr. O'Reilly had never been born; his removal is as complete as if caused by death. When he accepted the new office the other ceased to have an incumbent. It was not a case, therefore, for *quo warranto*, for that will lie only when the party proceeded against is either a *de facto* or a *de jure* officer in possession of the office. \* \* \*, and an office that is vacant is in possession of no one. Besides, such writ issues when facts are in dispute, and one object aimed at is to ascertain the facts; here no fact is disputed, but a mere question of law." Both of the reasons referred to in the *Kelly* case are applicable here. If the mayor accepted another office, the office of mayor automatically became vacant. Even apart from this consideration, there can be no need for resorting to quo warranto proceedings, since the material facts are not in dispute.

On the other hand, the complaint is insufficient in that it fails to set forth facts showing that the mayor accepted another civil office. It would be futile to permit an amendment to the pleading. While a colorably good complaint might be drawn up, it is evident that it could not be sustained in fact, and it would be idle to permit the litigation to continue.

The motion for a temporary injunction is denied. The motion to dismiss the complaint for insufficiency is granted. Settle order.