**HBO, A DIVISION OF TIME WARNER ENTERTAINMENT COMPANY, L.P.; Lee Grant; Virginia Cotts; Joseph Feury Productions, Inc.; and Home Box Office, Inc., Appellants,**

v.

**Kit HARRISON, Appellee.**

No. 14–96–01529–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Oct. 8, 1998.

**34**

Peter Drew Kennedy, Julie Anne Ford, R. James George, Jr., Austin, for appellants.

Charles R. Houssiere, III, David Ray Marshall, Monica Celeste Vaughan, David W. Holman, Houston, for appellees.

Before YATES, AMIDEI, JJ., and EDELMAN, J., concurring in the result only.

## OPINION

AMIDEI, Justice.

This appeal arises from a defamation suit brought by Kit Harrison (Harrison), appellee, against HBO, a Division of Time Warner Entertainment Company, L.P., Lee Grant, Virginia Cotts, Joseph Feury Productions, Inc., and Home Box Office, Inc., appellants. The trial court denied the motion for summary judgment filed by appellants, and they brought this interlocutory appeal. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(6) (Vernon Supp.1997).[1] We reverse and render.

## I. FACTUAL BACKGROUND

This is a defamation case arising out of a film, *Women on Trial,* broadcast by HBO in October of 1992. The film was made by Lee Grant and her husband's production company, Joseph Feury Production, Inc. Originally, the film was to be a documentary about divorce in general; however, after Grant and Virginia Cotts, a co-producer and researcher for the project, visited Houston, the focus of the film changed.

Ultimately, the film focused on four stories arising out of Texas courts. Three of the stories dealt with cases in the Houston family courts. Appellee was the court-appointed psychologist in one of these three cases. The theme of the production was stated in the narration of the film: "When a woman dares tŏ fight for the safety of her child, she is in danger of having that child taken away." The film, according to those involved in the project, gave voice to women who believed they were treated unfairly by the courts.

One of the women who appeared in *Women on Trial,* Sandi Hebert, had her case heard in former Judge Dean Huckabee's court. During the proceedings, the court, with the agreement of the parties, appointed psychologist Kit Harrison to do a psychologi-

---

1. Section 51.014(6) states:
 A person may appeal from an interlocutory order of a district court, county court at law, or county court that:
 (6) denies a motion for summary judgment that is based in whole or in part upon a claim against or defense by a member of the electronic or print media, acting in such capacity, or a person whose communication appears in or is published by the electronic or print media arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article 1, Section 8, of the Texas Constitution, or Chapter 73.
 TEX. CIV. PRAC. & REM.CODE ANN. § 51.014 (Vernon Supp.1997).

cal evaluation and arrive at an "independent conclusion as to the mental health, stability, and status of the parties and children the subject of this action."

In the Hebert case, Sandi Hebert sought a modification in custody based on her belief that her ex-husband was abusing her young son. Hebert ultimately lost custody of her child, and contact with him was terminated for several years. In Hebert's story, the creators and producers relied on interviews with Hebert, support groups, attorneys, child protective service personnel, a reporter, a police officer, the judge, and appellee. They also reviewed documents related to the case.

After the film aired, appellee filed suit alleging the film was defamatory because it unfairly and falsely criticized his handling of the Hebert case. Appellants filed a motion for summary judgment, which was denied by the trial court. Appellants then perfected this appeal.

## II. STANDARD OF REVIEW

■ The same standard of review which governs the granting of a summary judgment applies to the denial of a summary judgment. *See San Antonio Express News v. Dracos,* 922 S.W.2d 242, 247 (Tex.App.—San Antonio 1996, no writ); *Ervin v. James,* 874 S.W.2d 713, 715 (Tex.App.—Houston [14th Dist.] 1994, writ denied); *see also Freedom Communications, Inc. v. Brand,* 907 S.W.2d 614, 617 (Tex.App.—Corpus Christi 1995, no writ). Moreover, the standard for reviewing summary judgment is the same in defamation cases as in other types of cases. *See KTRK Television v. Felder,* 950 S.W.2d 100, 105 (Tex.App.—Houston [14th Dist.] 1997, no writ). That standard is well-established. Summary judgment for a defendant is proper only when the defendant negates at least one element of each of the plaintiff's theories of recovery or pleads and conclusively establishes each element of an affirmative defense. *See Science Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997) (citing *Gibbs v. General Motors Corp.,* 450 S.W.2d 827, 828 (Tex.1970); *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979)). When reviewing a summary judgment, the appellate court must take as true all evidence favorable to the nonmovant and indulge every reasonable inference in the nonmovant's favor. *See Science Spectrum,* 941 S.W.2d at 911 (citing *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 549 (Tex.1985). If the movant's motion and summary judgment proof facially establish its right to judgment as a matter of law, then the burden shifts to the non-movant to raise a fact issue sufficient to defeat summary judgment. *See City of Houston,* 589 S.W.2d at 678.

## III. SUMMARY JUDGMENT GROUNDS

Appellants raise fifteen points of error challenging the trial court's denial of their motion for summary judgment.[2] Points of error two through twelve are applicable to all appellants, while points thirteen through fifteen relate only to appellant Virginia Cotts and the libel claim against her based on a memorandum.

### A. PUBLIC OFFICIAL

In point of error eleven, appellants claim the trial court erred in denying their motion for summary judgment because appellee was a "public official," and the summary judgment evidence conclusively negated the essential element of "actual malice."

■ The degree and burden of proof required in a defamation case hinges on the

2. Point of error one is a *"Malooly"* point. *See Malooly Brothers, Inc. v. Napier,* 461 S.W.2d 119, 121 (Tex.1970) (a point of error that complains "the trial court erred in granting the motion for summary judgment"). This point of error is sufficient to allow argument as to all possible grounds upon which summary judgment should have been denied or granted. *Id.; see also Plexchem Int'l, Inc. v. Harris County Appraisal Dist.,* 922 S.W.2d 930, 930–31 (Tex.1996); *Loyd v. ECO Resources, Inc.,* 956 S.W.2d 110, 120 n. 1 (Tex.App.—Houston [14th Dist.] 1997, no. writ).

Although this first point of error is sufficient to preserve argument on all possible grounds upon which appellants allege summary judgment should have been granted, appellants raise fifteen points of error in which they specifically attack the trial court's denial of their motion for summary judgment. By addressing these fifteen points individually, we will be addressing point of error one. Accordingly, we find it unnecessary to specifically reference point of error one in the opinion.

status of the plaintiff as either a public official or private individual. *See Casso v. Brand,* 776 S.W.2d 551, 554 (Tex.1989); *Einhorn v. LaChance,* 823 S.W.2d 405, 412 (Tex. App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.). Because the First Amendment to the United Sates Constitution is premised on the belief that free and open debate on public issues must be protected, the United States Supreme Court has placed limitations on defamation actions. One such limitation is the rule first established in *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In that case, the Supreme Court held that a public official cannot recover damages for defamation relating to his official conduct unless he proves the statement was made with "actual malice," that is, with knowledge that it was false or with reckless disregard of whether it was false or not. *See New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 725–26. The Court also held that proof of actual malice must be established by "clear and convincing" evidence. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974).

█ Two prerequisites must be met for the actual malice standard to apply. First, the plaintiff must be a public official for the purposes of the published statements, and second, the allegedly defamatory statements must relate to the plaintiff's official conduct. *See Monitor Patriot Co. v. Roy,* 401 U.S. 265, 273–75, 91 S.Ct. 621, 626–27, 28 L.Ed.2d 35 (1971); *New York Times,* 376 U.S. at 283 n. 23, 84 S.Ct. at 728 n. 23; *Rogers v. Cassidy,* 946 S.W.2d 439, 444 (Tex.App.—Corpus Christi 1997, no writ); *Villarreal v. Harte–Hanks Communications, Inc.,* 787 S.W.2d 131, 133 (Tex.App.—Corpus Christi 1990, writ denied), *cert. denied,* 499 U.S. 923, 111 S.Ct. 1316, 113 L.Ed.2d 249 (1991). In this case, the allegedly defamatory remarks relate to appellee's conduct as a court-appointed psychologist in the Hebert case. Thus, we find the second prerequisite is satisfied.

As to the first prerequisite, we note that the *New York Times* Court had no occasion to determine how far down into the lower ranks of government employees the "public official" designation would extend, and did

not specify categories of persons who would or would not be included. *See Rosenblatt v. Baer,* 383 U.S. 75, 85, 86 S.Ct. 669, 675, 15 L.Ed.2d 597 (1966); *New York Times,* 376 U.S. at 283 n. 23, 84 S.Ct. at 728 n. 23; *Rogers,* 946 S.W.2d at 444 (citing *Villarreal,* 787 S.W.2d at 133). Since the *New York Times* decision, the Supreme Court has declined to pronounce a specific rule or devise a formalistic test to determine who constitutes a public official for purposes of defamation actions. *See Rogers,* 946 S.W.2d at 444 (citing *Villarreal,* 787 S.W.2d at 133). In *Rosenblatt,* however, the Court explained the public official designation when it considered a libel action brought by a nonelected, former supervisor, employed by county commissioners, against a newspaper. 383 U.S. at 85–86, 86 S.Ct. at 675–76. Weighing competing values of (1) a strong interest in debate on public issues and about persons in a position to influence their resolution, and (2) society's interest in preventing and redressing attacks upon reputation, the Court concluded that while the public official designation does not apply to all government employees, it does apply:

... at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.... Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees, both elements we identified in *New York Times* are present and the *New York Times* malice standards apply.

*Rosenblatt,* 383 U.S. at 85–86, 86 S.Ct. at 676 (footnotes omitted). The *New York Times* rule and the *Rosenblatt* "public official" designation have been applied in Texas defamation actions. *See, e.g., Foster v. Laredo Newspapers, Inc.,* 541 S.W.2d 809, 811–12 (Tex.1976), *cert. denied,* 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1977).

█ Applying the principles here, we first note that whether appellee is a public official

is a question of law to be determined by the court. *See Rosenblatt,* 383 U.S. at 88, 86 S.Ct. at 677. The evidence shows that as the court-appointed psychologist in the Hebert case, appellee's primary duty was to arrive at an independent conclusion as to the mental health, stability, and status of the parents and the children. Ultimately, however, former Judge Dean Huckabee, who appointed appellee, conferred upon appellee more than just investigative powers. By court order, the trial court gave appellee *the power to determine visitation* between mother and child.[3] Specifically, the order stated, in pertinent part:

> The Court finds that Sandra Hebert, the mother of Wayne Thomas Hebert, should have visitation of Wayne Thomas Hebert *as directed and recommended by Dr. Kit Harrison.*
>
> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Sandra Hebert *shall have visitation with Wayne Thomas Hebert as directed and recommended by Dr. Kit Harrison.* IT IS FURTHER ORDERED that *visitation between Sandra Hebert and her son, Wayne Thomas Hebert, shall occur as often as it is recommended, if it is recommended, by Dr. Kit Harrison* and as it becomes in the best interest of the child.

(emphasis added).

Appellants argue that because the court delegated its power to appellee to decide whether, when, and under what circumstances Sandi Hebert could see her child, appellee is a public official for purposes of this defamation action. In support of this argument, appellants point to a case in which a Texas court determined that a Child Protective Services (CPS) worker was determined to be a public official. *See Villarreal,* 787 S.W.2d at 134–35.

In *Villarreal,* the court found that to the people she dealt with, the CPS worker had sufficient power to remove children or cause them to be removed, to place them in foster homes, and establish conditions governing the circumstances by which the parents could regain custody. *See Villarreal,* 787 S.W.2d at 134. The court also found that the CPS worker was engaged in a vital function of state government, i.e., the protection of its citizens, and that her activities "had a significant impact on people's lives." *Id.* Thus, under the *Rosenblatt* standard, she appeared to the public to have substantial responsibility for, or control over, the conduct of government affairs, and this responsibility would reasonably lead the public to have an interest in her qualifications and performance beyond the general interest in all government employees. *Id.* (citing *Rosenblatt,* 383 U.S. at 85–86, 86 S.Ct. at 676. In concluding there was sufficient evidence to find that the CPS worker was a public official, the court also stated that it could not see how, in a society where child abuse is recognized as a burning issue, it could be argued that the CPS worker was not a person occupying a post that invites public scrutiny. *See Villarreal,* 787 S.W.2d at 134.

The *Villarreal* court is not alone in its determination. For example, the Tennessee Supreme Court, when confronted with a similar case, found that a junior social worker with the Tennessee Department of Human Services was a public official and stated:

> Any position of employment that carries with it duties and responsibilities affecting the lives, liberty, money or property of a citizen or that may enhance or disrupt his enjoyment of life, his peace and tranquility, or that of his family, is a public official within the meaning of the constitutional privilege.

*Press, Inc. v. Verran,* 569 S.W.2d 435, 441 (Tenn.1978). *See also, e.g., Kahn v. Bower,* 232 Cal.App.3d 1599, 1610, 284 Cal.Rptr. 244, 251 (1991) (holding that child welfare worker was public official because the duties of her position tended naturally to have large or dramatic impact on members of public); *Ryan v. Dionne,* 28 Conn.Supp. 35, 38, 248 A.2d 583, 585 (1968) (holding that delinquent tax collector was public official because he had duty and power to perform certain function in the public interest); *Hodges v. Okla-*

---

3. We express no opinion concerning the authority of the trial judge to bestow this type of authority on a court-appointed psychologist.

homa Journal Publishing Co., 617 P.2d 191, 194 (Okla.1980) (holding that license tag agent was public official because he held a position of substantial public impact, had duties that involved the collection and accounting for public funds, and administered an area of law that affected Oklahoma citizens).

 In this case, the responsibility given to appellee by court order was comparable to that exercised by the CPS worker in *Villarreal* and *Verran*. Appellee served as an investigator and had the authority to determine if, when, and under what circumstances Sandi Hebert could have contact with her son. While the court's order was in effect, appellee held all the powers of a family law judge insofar as visitation between Sandi Hebert and her son were concerned. Appellee, for all intents and purposes, *was* the judge, with the authority to determine Sandi Hebert's parental rights. Courts in this country have recognized, and we agree, that the exercise of sovereign power is an fundamental attribute of public office. *Steere v. Cupp*, 226 Kan. 566, 572, 602 P.2d 1267, 1272 (1979) (holding that attorney was not public official because his position "did not afford him the opportunity to exercise any sovereign power, an essential element of public office."); *Sowers v. Wells*, 150 Kan. 630, 633, 95 P.2d 281, 283 (1939) (holding that court-appointed attorney was not public official, but stating "it universally has been held that the right to exercise some definite portion of sovereign power constitutes an indispensable attribute of 'public office.' "); *Kingston Assocs., Inc. v. La Guardia*, 156 Misc. 116, 121, 281 N.Y.S. 390, 398 (1935) (stating that one indispensable attribute of public office is the right to exercise some portion of sovereign power). Accordingly, under the facts of this case, we hold appellee was a public official for purposes of defamation.

Our holding is consistent with other rulings on this subject by Texas courts. In *Foster v. Laredo Newspapers, Inc.*, an engineer brought a libel action against a newspaper that had printed a story attributing a severe flooding problem to the engineer, and suggesting he was guilty of impropriety by serving as both elected county surveyor and a paid consultant to the county. 541 S.W.2d at 811. The supreme court held that the allegedly defamatory statements did not relate to the engineer's official conduct as an elected county surveyor, and that the summary judgment proof failed to establish *that his position as a consulting engineer was sufficiently important to render him a public official* under *Rosenblatt. Id.* at 813–14 (emphasis added). In making its determination, the court noted that the engineer "had little authority to exercise on behalf of the County." *Id.* at 813. The supreme court's analysis in Foster establishes that in Texas, a person's authority and exercise of authority are critical in establishing status as a public official. *See also Houston Chronicle Publishing Co. v. Stewart*, 668 S.W.2d 727, 729 (Tex.App.—Houston [1st Dist.] 1983, writ dism'd) (holding that court reporter was not a public official because she does not possess the requisite importance or responsibility for control over government affairs).

Unlike the situation in *Foster*, the summary judgment proof establishes that appellee was given governmental authority. The trial court's order placed appellee in the position of determining a citizen's parental rights. It cannot reasonably be argued that a person occupying such a position in our society is not a public official.

 Appellee argues that he is not a public official because (1) he does not hold government office, and (2) he is not paid by the government. We do not find either of these contentions persuasive. First, we find it conceivable that an individual holding no formal public position, and standing in no employment or even contractual relationship with the government, nevertheless may participate in some governmental enterprise to such an extent that the policies underlying *New York Times* and *Rosenblatt* would demand he or she be classified as a public official. *See Jenoff v. Hearst Corporation*, 644 F.2d 1004, 1006 (4th Cir.1981); *Arctic Co. v. Loudoun Times Mirror*, 624 F.2d 518, 522 (4th Cir.1980) (recognizing that consultant to government entity could be considered a public official), *cert. denied*, 449 U.S. 1102, 101 S.Ct. 897, 66 L.Ed.2d 827 (1981). We do not accept that the phrase "govern-

mental employee," as used in *Rosenblatt*, was intended to limit it to those individuals who have a traditional "employer-employee" relationship with a governmental entity. *See Villarreal*, 787 S.W.2d at 134. We find that it extends to those who have, or appear to have, substantial responsibility over some aspect of governmental affairs. *Id.* As we have stated, appellee's authority in this case was that of a judge, and he had substantial control over and responsibility for Sandi Hebert and her son. We find the fact that he held no formal public office to be of no consequence.[4]

Second, while we recognize that appellee was not on the government payroll, we do not, however, find this to be in any way determinative of his status as a public official for purposes of a defamation suit. Appellee's statement that appellee "was not paid by the government; rather, his fees were paid by the parties" is rather disingenuous. The parties did not voluntarily pay appellee; rather, they were ordered by the court (the government) to pay appellee. Initially, appellee's fees were to be split between Sandi Hebert and her ex-husband. Eventually, however, Sandi Hebert was ordered by the court:

... to pay any and all costs required by Dr. Kit Harrison for testing and evaluating the child ... as it relates to a controlled circumstance relative to visitation between Sandra Hebert and the child ... Any and all costs for services of Dr. Kit Harrison as it relates to Sandra Hebert and Wayne Hebert shall be paid as is required by the psychologist, Dr. Kit Harrison.

Furthermore, we find that where the paycheck comes from is not determinative because it has little if nothing to do with the standard set out it *Rosenblatt*. The signature on a paycheck does not provide any information about the authority, duties, responsibility, or public concern related to the position in question. *See Steere*, 226 Kan. at 572, 602 P.2d at 1272 (holding that the fact that court-appointed attorney was paid by the state for his services did not make him a public official for defamation purposes).

Having found that as a matter of law appellee is a public official, we must now review the summary judgment proof to determine whether appellants negated the element of actual malice. In *New York Times*, the United States Supreme Court first held that the First and Fourteenth Amendments to the United States Constitution require a federal rule that prohibits a public official from re-

4. We recognize that the Supreme Court, in *Gertz*, declined to extend public official status to defendant, an attorney who appeared at a coroner's inquest. 418 U.S. at 351, 94 S.Ct. 2997. The court refused to recognize the defendant as a "de facto public official" because: (1) no such concept had been recognized before; and (2) such recognition would "sweep all lawyers under the *New York Times* rule as officers of the court." *Id.* We find the facts and reasoning of *Gertz* distinguishable.

First, in *Gertz*, the defendant had merely acted as an attorney and appeared at a coroner's inquest. In this case, the court-appointed psychologist, appellee, did not simply appear in court or make recommendations to the court; rather, the trial court gave authority to appellee to make determinations, which are normally in the exclusive province of the trial court, regarding the parties' rights. We do not suggest by our holding that appellee is a public official merely because he was a court-appointed psychologist who testified. Our holding is based on the *power* bestowed on appellee by the trial court. The power conferred on appellee is a power that was absent in *Gertz*, and a power that is not possessed by attorneys who

appear in court as representatives of clients. Our holding in this case, will not "sweep all lawyers under the *New York Times* rule" because our holding is not based on the status of the plaintiff, but rather on the power he possessed.

Second, the mere fact that a concept or rule is unrecognized is no barrier to its recognition in an appropriate case. In *Gertz*, the Supreme Court's refusal to recognize "de facto public official" status was based on the facts of the case before it. The undisputed facts in this case mandate a different result. Moreover, the Supreme Court's decision in *Gertz* is based solely on the First Amendment, while this case embraces not only the First Amendment, but the protection of article I, section 8 of the Texas Constitution. As many of our state courts have recognized, our constitution, in many aspects, is broader than the First Amendment. *See, e.g., O'Quinn v. State Bar of Texas*, 763 S.W.2d 397, 402 (Tex.1988) (noting that "Texas' free speech right [has been characterized] as being broader than its federal equivalent")

Accordingly, we find the Court's decision in *Gertz* is no barrier to our finding that appellee is a public official.

covering damages for a defamatory falsehood relating to the performance of official duties without clear and convincing proof that the statement was made with actual malice. 376 U.S. at 279–80, 84 S.Ct. at 726. *See also Casso,* 776 S.W.2d at 558; *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex.1989) (recognizing the same rule in Texas courts).

"Actual malice," as that term is used in defamation cases, is a term of art that is separate and distinct from traditional common-law notions of malice. *See Casso,* 776 S.W.2d at 558; *Brady v. Cox Enters., Inc.,* 782 S.W.2d 272, 276 (Tex.App.—Austin 1989, writ denied). It does not include ill will, spite, or evil motive; rather, it is the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true. *See Gertz,* 418 U.S. at 328, 94 S.Ct. at 3001; *Gonzales v. Hearst Corp.,* 930 S.W.2d 275, 277 (Tex.App.—Houston [14th Dist.] 1996, no writ). "Reckless disregard" is defined as a high degree of awareness of probable falsity, and the evidence must show that the defendant in fact entertained serious doubts as to the truth of the publication. *See St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *Casso,* 776 S.W.2d at 558. This stringent standard is imposed upon plaintiffs to prevent a chilling effect on the uninhibited debate of public issues. *See Ross v. Labatt,* 894 S.W.2d 393, 395 (Tex.App.—San Antonio 1994, writ dism'd w.o.j.).

Before 1989, the law was clear that an affidavit of an interested witness, usually the alleged defamer, as to his or her state of mind, even if uncontroverted, was not sufficient to negate actual malice and support a summary judgment. *See Bessent v. Times–Herald Printing Co.,* 709 S.W.2d 635 (Tex. 1986); *Beaumont Enterprise & Journal v. Smith,* 687 S.W.2d 729 (Tex.1985). The decisions in *Bessent* and *Beaumont Enterprise* made summary judgment virtually impossible to obtain in defamation cases because the movant's burden of showing the absence of malice was unreachable. *See Casso,* 776 S.W.2d at 557; *Hailey v. KTBS, Inc.,* 935 S.W.2d 857, 860 (Tex.App.—Texarkana 1996, no writ). The supreme court, however, overruled *Bessent* and *Beaumont Enterprise* in 1989 when it issued its decision in *Casso.* 776 S.W.2d at 559.

The Texas summary judgment rule permits the granting of a summary judgment on the basis of uncontroverted testimony of an interested witness as long as that evidence "is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies and could have been readily controverted." *See Casso,* 776 S.W.2d at 558 (quoting TEX.R. CIV. P. 166a(c)). The supreme court reasoned that the decisions in *Bessent* and *Beaumont Enterprise* applied the final prong of rule 166a(c) too literally, interpreting the phrase "could have been readily controverted" to mean that the movant's summary judgment proof could have been easily and conveniently rebutted. *See Casso,* 776 S.W.2d at 558. This caused summary judgment in defamation cases to become more difficult to obtain, even as the plaintiff's opportunity to prevail on the merits became more remote. *Id.* The court held that the more reasoned interpretation of "could have been readily controverted" was that the testimony at issue is of a nature that can be effectively countered by opposing evidence. *Id.; see also Trico Technologies Corp. v. Montiel,* 949 S.W.2d 308, 310 (Tex. 1997). If the credibility of the affiant or deponent is likely to be dispositive, then summary judgment is not appropriate; however, if the non-movant must come forward with independent evidence to prevail, the summary judgment may well be proper in the absence of such controverting proof. *Id.*

In defamation cases, it is not enough for the jury to disbelieve the defendant's testimony. *See Casso,* 776 S.W.2d at 558. In a trial, the plaintiff must prove by clear and convincing evidence that the declarant acted with actual malice. *Id.* Thus, because the credibility of alleged defamer, the probable affiant or deponent in a summary judgment case, is not the dispositive factor, summary judgment may be proper in the absence of controverting proof. The supreme court concluded that, as in all other types of cases, summary judgment motions in defamation cases should not be denied merely because of a subjective determination

that the movant's proof cannot be readily controverted. *Id.* at 559.

From the time of *Casso,* countless Texas courts have found affidavits sufficient to negate the element of actual malice, thereby supporting summary judgment in defamation cases when those affidavits were uncontroverted. *See, e.g., Rogers v. Cassidy,* 946 S.W.2d at 446; *Morris v. Dallas Morning News, Inc.,* 934 S.W.2d 410, 421 (Tex.App.— Waco 1996, writ denied); *Dracos,* 922 S.W.2d at 256; *Brand,* 907 S.W.2d at 622; *Labatt,* 894 S.W.2d at 396–97; *Johnson v. Southwestern Newspapers Corp.,* 855 S.W.2d 182, 187– 88 (Tex.App.—Amarillo 1993, writ denied); *Brady,* 782 S.W.2d at 276. The present case is no exception.

To negate actual malice, appellants submitted affidavits from three persons involved with the *Women on Trial* project: (1) Virginia Cotts, co-producer and principal researcher; (2) Lee Grant, director and narrator, and an officer of Joseph Feury Production, Inc.; and (3) Sheila Nevins, vice-president of documentaries and family programing for HBO. In her affidavit, Cotts described in detail how the documentary was made and the steps she took to thoroughly investigate the information that would be presented in the film. Cotts also swore that she believed the information presented in the film relevant to the Hebert case was true, specifically that she believed Sandi Hebert's ex-husband had abused their son. Cotts also stated that she believed the specific statements in the film concerning appellee were true and she had no reason to doubt the truth of those statements.

In her affidavit, Grant stated that she supervised the process by which the film was researched, filmed, and edited. She stated that the specific information in the film concerning appellee was taken from his deposition in the Hebert case, and that she believed the statements were true and she never entertained any doubts about the truth of the statements. Finally, Grant swore that she selected or approved the selection of all of the statements contained in *Women on Trial.* As to her belief in the truth of the statements in the film, she stated:

I believed, and I still believe, that all of those statements are true. Virginia Cotts was responsible for checking the accuracy of these statements. In speaking with people in Houston and with Virginia Cotts, I never became aware of any information that made me think any of the facts included in the narration or other statements were not completely accurate and truthful.

Finally, appellant submitted the affidavit of Sheila Nevins. She testified that she relied on Grant and the production company for accuracy, and based on her past experience with them, "had no doubt they would produce an accurate and truthful documentary." Nevins stated she was aware that the producers were taking steps to ensure the accuracy of the film, and had no reason to doubt the quality of the work. She specifically stated that the amount of time and effort that was being put into the "fact-checking aspect of this documentary" gave her further reason to believe a proper investigation was being conducted. Nevins specifically swore:

I had no knowledge that any statement in the documentary, whether in the documentary's narration or made by a person interviewed in the documentary, was untrue. I believed that the statements were true. I had no doubts as to the truth of any such statement. In particular, I had no doubts about the truth of any statement in the documentary concerning Plaintiff Dr. Kit Harrison, and I believed those statements to be true.

An affidavit setting forth the absence of actual malice is sufficient to carry the movant's summary judgment burden of proof. *See Casso,* 776 S.W.2d at 558; *Carr,* 776 S.W.2d at 571; *Dracos,* 922 S.W.2d at 256. The combination of the summary judgment proof provided by appellants through the affidavits of Cotts, Grant, and Nevins is clearly sufficient to negate the element of actual malice. *Id.* These affidavits confirm that those involved in the making of the film and those acting on behalf of HBO believed the information in the documentary was true or that they did not have a high degree of awareness as to the probable falsity of the information. By negating actual malice, ap-

pellants established their right to judgment as a matter of law. *See Casso,* 776 S.W.2d at 558; *Labatt,* 894 S.W.2d at 395. Once appellants established their right to judgment, the burden shifted to appellee to offer sufficient summary judgment proof to raise an issue of fact on the question of actual malice. *See Rogers,* 946 S.W.2d at 446; *Labatt,* 894 S.W.2d at 396; *Schauer v. Memorial Care Sys.,* 856 S.W.2d 437, 450 (Tex.App.—Houston [1st Dist.] 1993, no writ); *see also City of Houston,* 589 S.W.2d at 678 (holding that once movant established right to summary judgment, burden shifts to nonmovant to demonstrate otherwise); TEX.R. CIV. P. 166a(c).

To overcome appellants' entitlement to judgment, appellee had to offer specific, affirmative proof to show that appellants either knew the publication was false or entertained serious doubts as to its truth. *See Dracos,* 922 S.W.2d at 256; *Howell v. Hecht,* 821 S.W.2d 627, 631 (Tex.App.—Dallas 1991, writ denied). We have reviewed the summary judgment proof that appellant contends raises a fact issue as to actual malice. Specifically, he points to evidence that he contends shows a deliberate effort to avoid the truth and obvious reasons to doubt Sandi Hebert's veracity. Appellee also argues that appellants' failure to interview certain witnesses, who would have easily confirmed a contrary version of the Hebert story, is some evidence of actual malice.

After reviewing the evidence in the light most favorable to appellee, we find it shows little more than (1) editorial choices; (2) a difference in opinion; or, at worst, (3) a failure to investigate. As to the editorial choices, we find this is no evidence of malice. The United States Supreme Court stated:

> The choice of material to go into a newspaper, and *the decisions made as to* limitation on the size and content of the paper, and *treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment.* It has yet to be demonstrated how governmental regulation of this crucial process can be exercised with First Amendment guarantees of a free press as they have evolved to this time.

*Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 258, 94 S.Ct. 2831, 2840, 41 L.Ed.2d 730 (1974) (emphasis added); *see also Machleder v. Diaz,* 801 F.2d 46, 53 (2d Cir.1986) ("[A] rule that would hold a media defendant liable for broadcasting truthful statements and actions because it failed to include additional facts that might have cast the plaintiff in a more favorable or balanced light ... violates the First Amendment.").

■■■ The editorial choice to exclude certain information, in this case, interviews of people with a contrary view, is not specific, affirmative proof that shows appellant knew the publication was false or entertained serious doubts about its truthfulness. Appellants' decision to exclude certain information from the documentary is a protected exercise of editorial control and judgment, not evidence of actual malice. *See Tornillo,* 418 U.S. at 258, 94 S.Ct. at 2840; *Machleder,* 801 F.2d at 53.

Next, it is clear that there is a difference of opinion among the people involved and represented in *Women on Trial.* For example, neither the trial judge or appellee believed that Sandi Hebert's ex-husband had abused their son. Cotts, Grant, and others, however, strongly believed that he did. Moreover, some people obviously believed the Houston family court system was unfair to women, while others held an opposing view. This does not prove that anyone involved in the production of the film subjectively believed the statements in the film were untrue.

■■■ Finally, a failure to investigate, without more, cannot establish actual malice. *See Gertz,* 418 U.S. at 343, 94 S.Ct. at 3008–9; *Doubleday & Co., Inc. v. Rogers,* 674 S.W.2d 751, 756 (Tex.1984). There must be evidence at least that the defendants purposefully avoided the truth. *See Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 685, 109 S.Ct. 2678, 2694, 105 L.Ed.2d 562 (1989). That a defendant did not verify information, without more, cannot constitute proof of actual malice. *Id.; St. Amant,* 390 U.S. at 732–33, 88 S.Ct. at 1326–27. A plaintiff's allegation that the defendant was negligent in addressing the truth of a statement

will be successful only when "the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation [or when] there are obvious reasons to doubt the veracity of [his source]." *St. Amant*, 390 U.S. at 732, 88 S.Ct. at 1326.

■ The evidence in this case, even when it is viewed in the light most favorable to appellee, and every reasonable inference is indulged in his favor, shows nothing more than a "he said, she said" situation. In each of the stories presented, a woman told her side of the story. Others who were interviewed stated their views on the specific cases and the system in general. While there might be some who doubt the stories, and those views could have been investigated and presented in the film, there is no evidence in this record, beyond mere surmise or suspicion, which shows that appellants doubted the veracity of their sources or the truth of the statements presented in the film. *See Schauer*, 856 S.W.2d at 450 (holding that mere surmise or suspicion of malice does not carry the probative force necessary to form the basis of a legal inference of malice) (citing *International & G.N.R. Co. v. Edmundson*, 222 S.W. 181, 185 (Tex. Comm'n App. 1920, holding approved)). There is nothing to show that the allegations contained in the film were so improbable that including them amounted to recklessness. Even assuming the statements in the film are false, and that appellants were negligent and altogether failed to investigate the matter, this is insufficient to raise a fact issue as to malice. *See El Paso Times, Inc. v. Trexler*, 447 S.W.2d 403, 406 (Tex.1969).

After a thorough review of the parties' arguments and the summary judgment proof, we hold appellants presented sufficient evidence to disprove actual malice as a matter of law. We also hold that appellee presented no controverting proof that appellants believed that the statements in question were false or published with disregard for the truth. We sustain appellants' eleventh point of error.

## B. THE COTTS' MEMORANDUM

In points of error thirteen through fifteen, appellants contend the trial court erred in denying their motion for summary judgment as to appellant Virginia Cotts. In their brief relevant to these points, they address three of the thirteen statements that appellee claimed supported liability against Cotts. Appellee argues the trial court correctly denied appellants' motion for summary judgment because in their motion for summary judgment, they addressed and attacked only the three statements in the memorandum. We disagree.

In his petition and first amended petition, appellee alleged Virginia Cotts was liable based on thirteen defamatory statements. Ten of those thirteen statements were published in the film and asserted as grounds for liability against all of the appellants (except Randy Burton).[5] When appellants filed their motion for summary judgment, it was filed on behalf of *all* appellants, including Cotts, and the motion specifically addressed the ten statements in question. As to the ten statements in the film, appellants argued, among other things that appellee was a public official and there was no actual malice. This argument and the evidence in support of it was applicable to Cotts. We have addressed this argument and found it meritorious. Thus, the only remaining issues are those relevant to the other three statements, those made by Cotts in a memorandum. These statements were addressed separately by appellants in their motion for summary judgment. Thus, we find that appellants did address all of the grounds asserted against appellants, including appellant Cotts. Because we have already determined appellants were entitled to judgment based on the ten statements published in the film, we must now address the statements in the Cotts memorandum.

In a memorandum, Cotts made three statements about appellee that he claims were defamatory: (1) "The man makes good points about child abuse, but for me, he has no credibility;" (2) "I am appalled at how little Dr. Harrison knows of the facts in this

5. Though suit was brought against Randy Burton, he did not file a motion for summary judgment and is not part of this appeal because he was nonsuited by appellee.

case;" and (3) "If he was telling the truth, he is shamefully ignorant." In their motion for summary judgment, appellants argued they were entitled to judgment as to these three statements, which were published in the memorandum, not the film, because: (1) the summary judgment evidence negated the essential element of publication; (2) the summary judgment evidence established the memorandum was privileged and not published with actual malice; and (3) the summary judgment evidence established the statements were protected opinion.

 Publication is an essential element of an action for defamation. *See Renfro Drug Co. v. Lawson,* 138 Tex. 434, 160 S.W.2d 246, 249 (1942); *Felder,* 950 S.W.2d at 105; *Simmons v. Ware,* 920 S.W.2d 438, 444 (Tex. App.—Amarillo 1996, no writ). In an affidavit in support of the motion for summary judgment, Cotts stated that she wrote the memorandum, and that after she wrote it, "it remained in the files of Joseph Feury Productions, Inc." She testified that it was part of her job to record her research, and that the memorandum was to be used for her reference.

 This evidence, which is undisputed by appellee, proves as a matter of law there was no publication of these statements. Appellee does not dispute appellants' contention that the memorandum came to light only when it was produced as part of the discovery production in this case. Communications and publications made in the due course of a judicial proceeding will not serve as the basis of a defamation action. *See James v. Brown,* 637 S.W.2d 914, 916 (Tex.1982) (citing *Reagan v. Guardian Life Ins. Co.,* 140 Tex. 105, 166 S.W.2d 909, 912 (1942)); *Thomas v. Bracey,* 940 S.W.2d 340, 342–43 (Tex.App.—San Antonio 1997, no writ). This absolute privilege has been extended to communications made in contemplation of and preliminary to judicial proceedings. *See Thomas,* 940 S.W.2d at 343.

 We hold that the statements in the memorandum were not published, and that once they were produced in this suit, they were absolutely privileged. We sustain points of error thirteen and fourteen.

## C. REMAINING GROUNDS

 When a summary judgment order does not specify the grounds upon which the ruling was made, the reviewing court will affirm the judgment if any one of the theories advanced in the motion are meritorious. *See State Farm Fire & Cas. Co. v. S. S.,* 858 S.W.2d 374, 380 (Tex.1993); *Carr,* 776 S.W.2d at 569; *Hall v. Tomball Nursing Ctr., Inc.,* 926 S.W.2d 617, 619 (Tex.App.—Houston [14th Dist.] 1996, no writ). By analogy, on appeal from the denial of a summary judgment, we may reverse and render judgment if any of the grounds stated in the movant's motion are meritorious. Because we have determined that appellants (1) negated the element of actual malice as to any statement in the film, and (2) negated the element of publication as to the statements in the Cotts memorandum, we need not consider the other grounds raised in the motion and in this appeal. *See Cincinnati Life Ins. Co. v. Cates,* 927 S.W.2d 623, 626 (Tex.1996) (holding that courts of appeals should consider all summary judgment grounds that are *necessary* for final disposition of the appeal).

## IV. CONCLUSION

The Texas Constitution and decisions by the courts of the state establish that Texas is committed to the idea of free speech. Our desire for free speech was a factor that led to our revolution for independence from Mexico. *See Labatt,* 894 S.W.2d at 394 (citing ROBERT A. CALVERT AND ARNOLDO DE LEON, THE HISTORY OF TEXAS, 56–58 (1990); JOURNAL OF THE CONSTITUTIONAL CONVENTION, 62 (1875); JOHN SAYLES, INTRODUCTION TO THE TEXAS CONSTITUTION, 129–35 (4th ed. 1893); Robert E. Hall, *Remonstrance—Citizen's Weapon Against Government's Indifference,* 68 TEX. L.REV. 1409, 1412–21 (1990); Arvel Ponton III, *Sources of Liberty in the Texas Bill of Rights,* 20 ST. MARY'S L.J. 93, 100 (1988)). Throughout all of the versions of the Texas Constitution, the framers rejected language similar to that contained in the United States Constitution, which is written only to restrict the government's ability to abridge free speech. *See Labatt,* 894 S.W.2d at 394. Instead, Texas chose a version of free speech

that granted to the people an affirmative right to free speech. *Id.* This suggests a desire by Texans to ensure broad liberty of speech. *Id.* (citing *Davenport v. Garcia,* 834 S.W.2d 4, 8 (Tex.1992); *Casso,* 776 S.W.2d at 556; *O'Quinn v. State Bar of Texas,* 763 S.W.2d 397, 401 (Tex.1988)). In keeping with this tradition, Texas courts have required a non-movant in a summary judgment case to come forward with specific, concrete evidence of actual malice to defeat summary judgment once the movant has negated that element as a matter of law. *See Dracos,* 922 S.W.2d at 256; *Howell,* 821 S.W.2d at 631. In this case, the evidence presented by appellee was insufficient to raise a fact issue. Accordingly, we reverse the trial court's judgment and render judgment in favor of appellants.