# Application of the Emoluments Clause to a Member of the President's Council on Bioethics

A member of the President's Council on Bioethics does not hold an "Office of Profit or Trust" within the meaning of the Emoluments Clause of the Constitution.

March 9, 2005

MEMORANDUM OPINION FOR THE ASSOCIATE COUNSEL TO THE PRESIDENT

You have asked whether a member of the President's Council on Bioethics holds an "Office of Profit or Trust" under the Emoluments Clause of the Constitution, Article I, Section 9, Clause 8. As we previously advised you, we conclude that he does not. This memorandum memorializes and expands upon our earlier advice.

## I.

On November 28, 2001, the President issued Executive Order 13237, 3 C.F.R. 821 (2001 Comp.), creating the President's Council on Bioethics (the "Council" or "Bioethics Council"). The purpose of the Bioethics Council is to "advise the President on bioethical issues that may emerge as a consequence of advances in biomedical science and technology." *Id.* § 2(a). The Council is composed of 18 members "appointed by the President from among individuals who are not officers or employees of the Federal Government." *Id.* § 3(a). Each member serves a two-year "term of office," subject to re-appointment. *Id.* § 3(c). Members of the Council may be compensated "to the extent permitted by Federal law" and "may be allowed travel expenses, including per diem in lieu of subsistence, as authorized by law for persons serving intermittently in Government service (5 U.S.C. 5701–5707), to the extent funds are available," *id.* § 4(d); pursuant to these provisions, we understand that each member receives $250 in compensation per day of work in addition to travel expenses. Although they are not required to do so by the Executive Order, we understand that members of the Council take an oath of office. We also understand that members of the Council do not have access to classified information.

The Council serves in a purely "advisory role." *Id.* § 2(a). It may, for example, "conduct inquiries, hold hearings, and establish subcommittees," *id.* § 4(b), and "conduct analyses and develop reports or other materials," *id.*, but it is "not . . . responsible for the review and approval of specific projects or for devising and overseeing regulations for specific government agencies," *id.* § 2(d). Nor does the Executive Order give the Council subpoena authority or the authority to implement any of its recommendations, whether at the President's direction or otherwise. In short, although the Council may offer its views to the President, it is

without power to implement those views or execute any other governmental authority.

The question before us is whether membership on the Council—which, as explained, is a purely advisory position that carries with it no power to execute any governmental authority, significant or otherwise, and has no access to classified information—is "any Office of Profit or Trust under [the United States]" within the meaning of the Emoluments Clause. U.S. Const. art. I, § 9, cl. 8. We conclude that it is not.

## II.

The Emoluments Clause of the Constitution provides in pertinent part that

> no Person holding any *Office of Profit or Trust under [the United States]*, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State.

U.S. Const. art. I, § 9, cl. 8 (emphasis added).[1] We conclude that membership on the Council is not "any Office of Profit or Trust under [the United States]" within the meaning of the Emoluments Clause. We first conclude that in order to qualify as an "Office of Profit or Trust under [the United States]," a position must, first and foremost, be an "Office under the United States." Next, we conclude that it is well-established that a purely advisory position is not an "Office under the United States" and, hence, not an "Office of Profit or Trust under [the United States]." Because a purely advisory position is not an "Office," we need not precisely define whether or to what extent the words "of Profit or Trust" narrow the category of offices governed by the Emoluments Clause.

## A.

In order to hold an "Office of Profit or Trust under [the United States]" within the meaning of the Emoluments Clause, an individual must hold an "Office . . . under [the United States]." This conclusion follows from the text of the Emoluments Clause. It is further confirmed by the ratification history of the Clause, which is admittedly limited, and by its early applications. Finally, our conclusion is confirmed by every judicial decision that has addressed the issue.

The text of the Emoluments Clause suggests that an "Office of Profit or Trust under [the United States]" must be an "Office under the United States." As

---

[1] In full, Article I, Section 9, Clause 8 states: "No Title of Nobility shall be granted by the United States: And no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."

discussed below, to the extent that the phrase "of Profit or Trust" is relevant, it may serve to narrow an "Office . . . under [the United States]" to those that are "of Profit or Trust," or an "Office of Profit or Trust" may be synonymous with an "Office . . . under [the United States]," but it is clear that the words "of Profit or Trust" do not expand coverage of the Emoluments Clause beyond what would otherwise qualify as an "Office . . . under [the United States]." This conclusion is apparent first and foremost by the phrase "Office of Profit or Trust under [the United States]" itself, which by its terms suggests that an office of profit or trust is necessarily a type of "Office . . . under [the United States]"—either one of "Profit" or one of "Trust." It is also confirmed by the remainder of the Emoluments Clause. In particular, the Emoluments Clause uses the term "Office" twice: first, in its reference to "any Office of Profit or Trust under [the United States]," and second, in its reference to "any present, Emolument, Office, or Title, of any kind whatever." The second reference—to "any . . . Office . . . of any kind whatever"—suggests that the first reference—to "any Office of Profit or Trust under [the United States]"—is narrower, not broader, than the second. Taken as a whole, then, the text of the Emoluments Clause suggests that an "Office of Profit or Trust under [the United States]" must, at a minimum, be an "Office under the United States." This conclusion is confirmed by the ratification history and early applications of the Emoluments Clause as well as relevant case law.

That the phrase "Office of Profit or Trust under [the United States]" is meant to be no more expansive than the phrase "Office under the United States" is confirmed by the limited discussion by the Framers and ratifiers of the Constitution as to the original understanding of the Emoluments Clause. This limited discussion reflects the assumption that the phrase "Office of Profit or Trust" was understood to be synonymous with the term "Office," with no particular emphasis placed on the additional words "of Profit or Trust." Governor Randolph, for example, who had attended the Philadelphia convention, explained to the Virginia ratifying convention that the Emoluments Clause

> restrains any persons *in office* from accepting of any present or emolument, title or office, from any foreign prince or state. This restriction is provided to prevent corruption. All men have a natural inherent right of receiving emoluments from any one, unless they be restrained by the regulations of the community. An accident which actually happened, operated in producing the restriction. A box was presented to our ambassador by the king of our allies. It was thought proper, in order to exclude corruption and foreign influence, to prohibit *any one in office* from receiving or holding any emoluments from foreign states. I believe, that if at that moment, when we were in harmony with the King of France, we had supposed that he was corrupting our ambassador, it might have disturbed that confidence,

and diminished that mutual friendship, which contributed to carry us through the war.

3 *The Records of the Federal Convention of 1787*, at 327 (Max Farrand ed., rev. ed. 1966) (emphases added) (footnote omitted) ("*Records*"). Likewise, according to Madison's notes, the Emoluments Clause was proposed at the convention by Charles Pinckney, who "urged the necessity of preserving *foreign Ministers & other officers* of the U.S. independent of external influence and moved to insert [the Emoluments Clause]." 2 *Records* at 389 (emphasis added).[2] These two statements are the only contemporaneous explanations of the Emoluments Clause that we have discovered, and both reflect an understanding that it encompasses public "offices" generally.

The early applications of the Emoluments Clause likewise reflect the assumption that an "Office of Profit or Trust" is synonymous with the term "Office under the United States." The Fifth Congress, for example, was the first to face an issue involving the Emoluments Clause when, in 1798, Thomas Pinckney asked Congress for permission to retain small presents he received from the Kings of Great Britain and Spain upon his departure from Europe after serving as Ambassador to those countries. *See* 8 Annals of Cong. 1582 (1798); David. P. Currie, *The Constitution in Congress: The Federalist Period, 1789–1801*, at 281 (1997). Congress refused to give permission. *See* 7 Annals of Cong. 553 (Senate granting consent); 8 *id*. at 1593 (House refusing consent). In the debate that ensued, the participants seemed to assume that the term "Office of Profit or Trust" was synonymous with "officer of the United States" (and further, that the Emoluments Clause was aimed primarily at ambassadors and foreign ministers). The statement of Representative Bayard is illustrative. He observed with respect to an identical provision found in the Articles of Confederation[3]:

---

[2] According to Madison's notes, the Clause was proposed by "Mr. Pinckney." Madison's custom was to refer to Charles Pinckney as "Mr. Pinckney" and to refer to Charles Cotesworth Pinckney (Charles Pinckney's cousin and fellow delegate from South Carolina) as "Genl. Pinckney," as Charles Cotesworth Pinckney completed his Revolutionary War service as a brevet brigadier general. *Compare, e.g.*, *id*. (statement of "Mr. Pinckney"), *with* 2 *id.* at 373 (statement of "Genl. Pinckney").

[3] Article VI of the Articles of Confederation provided: "[N]or shall any person holding *any office of profit or trust under the United States*, or any of them, accept any present, emolument, office or title of any kind whatever from any king, prince or foreign State." Articles of Confederation art. VI, 1 Stat. 5 (1778) (emphasis added). An earlier draft of the Articles contained broader language that would have prohibited "*any Servant or Servants of the United States*" from accepting any such "Present, Emolument, Office, or Title." Articles of Confederation art. IV (July 12, 1776 draft), *in* 5 *Journals of the Continental Congress* 547 (1904–37) (emphasis added). By substituting the phrase "any person holding an office of profit or trust under the United States" for the phrase "any Servant or Servants of the United States," the drafters may have intended to narrow the scope of the clause to a particular type of government servant, which is consistent with our conclusion. *Cf.* Articles of Confederation art. IV (Aug. 20, 1776 draft), *in* 5 *Journals of the Continental Congress* 675 (noting this change, without explanation). We have found no additional drafting history or practice regarding the parallel phrase in the Articles of Confederation that would further illuminate the question before us.

> Under the old articles of Confederation, a like provision was in be-ing, only that the receipt of presents by our Ministers was positively forbidden, without any exception about leave of Congress; but their being allowed to be received under the present Government, by the consent of Congress, shows that they might be received in certain cases. He had indeed, been informed that, notwithstanding the prohi-bition under the former Constitution, presents were frequently re-ceived by Ministers; for, though persons holding *offices* were forbid-den to receive presents, the moment their *office* ceased, and they became private individuals, they were no longer prohibited from re-ceiving any presents which might be offered to them. Under these circumstances he thought the resolution ought to be agreed to.

8 Annals of Cong. 1583–84 (emphases added).

Likewise, in 1817, Secretary of State John Quincy Adams issued instructions to the United States ambassador to England forbidding U.S. foreign ministers from accepting gifts from a foreign government:

> The acceptance of such presents by ministers of the United States is expressly prohibited by the constitution; and even if it were not, while the United States have not adopted the custom of *making* such presents to the diplomatic agents of foreign Powers, it can scarcely be consistent with the delicacy and reciprocity of intercourse be-tween them, for the ministers of the United States to receive such fa-vors from foreign Princes, as the ministers of those Princes never can receive from this Government in return. The usage, exceptionable in itself, can be tolerated only by its reciprocity. It is expected by the President, that every offer of such present which may, in future, be made to any public minister or *other officer of this Government*, abroad, will be respectfully, but decisively declined.

H.R. Rep. No. 23-302, at 3 (1834) (reprinting Adams's instructions) (second emphasis added). On one occasion in 1834 when these instructions were not followed, President Jackson asked Congress to consent to a particular gift. President Jackson noted:

> I deem it proper on this occasion to invite the attention of Congress to the presents which have heretofore been made to our *public offi-cers*, and which have been deposited under the orders of the Gov-ernment in the Department of State.

Letter to the Senate and House of Representatives (Jan. 6, 1834), *in* 3 *A Compila-tion of the Messages and Papers of the Presidents* 1256, 1256 (James D. Richard-son ed., 1897) (emphasis added). He then explained:

> The provision of the Constitution which forbids any *officer*, without the consent of Congress, to accept any present from any foreign power may be considered as having been satisfied by the surrender of the articles to the Government, and they might now be disposed of by Congress to those for whom they were originally intended, or to their heirs, with obvious propriety in both cases, and in the latter would be received as grateful memorials of the surrender of the present.

*Id*. at 38 (emphasis added).

Finally, the judicial decisions addressing the meaning of the phrase "office of profit or trust," mostly state court cases, and leading treatises, all state or assume that an "office of profit or trust" must be a public "office." *See, e.g.*, *Shepherd v. Commonwealth*, 1 Serg. & Rawle 1, 9 (Pa. 1814) (a "commissioner of the Commonwealth" did not hold an "office of profit under th[e] Commonwealth" because he did not hold an "office"); *Opinion of the Justices*, 3 Me. (Greenl.) 481, 481–82 (1822) (an "agent[] for the preservation of timber on the public lands" did not hold an "office of profit under th[e] State" because he did not occupy an "office" of any sort); *Commonwealth ex rel. Bache v. Binns*, 17 Serg. & Rawle 219, 220 (Pa. 1828) (a printer selected by the U.S. Secretary of State to print congressional reports did not hold an "office of profit . . . or trust, under the government of the United States" because the position of printer was not an "office"); *Shelby v. Alcorn*, 36 Miss. 273, 290 (1858) (a levee commissioner held a "civil office of profit under th[e] State" because he occupied a "civil office" "under the State"); *In re Corliss*, 11 R.I. 638, 641 (1876) (commissioners on the U.S. Centennial Commission held an "office of trust" because "they are, properly speaking, officers, and . . . the places which they hold are offices"); *State ex rel. Gilson v. Monahan*, 84 P. 130, 133 (Kan. 1905) (the director of a drainage district did not hold an "office of public trust" because he did not hold a "public office"; "[t]he words 'office of public trust'" in the Kansas Constitution "are equivalent to 'public office'"); *Kingston Assocs., Inc. v. LaGuardia*, 156 Misc. 116, 118–19, 121 (N.Y. Sup. Ct. 1935) (an advisory position was not a "civil office of honor, trust, or emolument under . . . the United States" because it lacked an "indispensable attribute of public office"); Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* § 13 (1890) ("*Law of Public Offices*") (defining an "Office of Profit" as a type of "office"); *id*. § 16 (same for "Office of Trust"); 3 Joseph Story, *Commentaries on the Constitution* §§ 1345–46 (1833; reprint 1991) ("[T]he [Emoluments Clause] is highly important, as it puts it out of the power of *any officer of the government* to wear borrowed honours, which shall enhance his supposed importance abroad by a titular dignity at home.") (emphasis added); 1 St. George Tucker, *Blackstone's Commentaries* 295–96 & n.* (1803; reprint 1996) ("*Tucker's Blackstone*") ("In the reign of Charles the second of England, that prince, and almost all his officers of state were either actual pensioners of the court

of France, or supposed to be under its influence, directly, or indirectly, from that cause. The reign of that monarch has been, accordingly, proverbially disgraceful to his memory. The economy which ought to prevail in republican governments, with respects to salaries and other emoluments of office, might encourage the offer of presents from abroad, if the constitution and laws did not reprobate their acceptance. Congress, with great propriety, refused their assent to one of their ministers to a foreign court, accepting, what was called the usual presents, upon taking his leave: a precedent which we may reasonably hope will be remembered by all future ministers, and ensure a proper respect to this clause of the constitution [the Emoluments Clause], which on a former occasion is said to have been overlooked."); *see also Oath of Clerks in the Executive Departments*, 12 Op. Att'y Gen. 521, 521–22 (1868) (the phrase "office of honor or profit" in the Act of July 2, 1862, ch. 128, 12 Stat. 502, includes only those who "are within the legal designation of officers"). Indeed, we are aware of no judicial decision that has even suggested that a government position that fails to qualify as a public "office" could nevertheless qualify as an "office of profit or trust."

Because a position must qualify as a public "office" in order to constitute an "Office of Profit or Trust," it is unnecessary for us to resolve definitively whether and to what extent the phrase "of Profit or Trust" narrows the category of public offices that are governed by the Emoluments Clause. Nevertheless, a few general observations may be warranted, as they confirm that the phrase does not expand the Emoluments Clause beyond public "offices" generally.

That phrase seems to be a term that had a technical significance at English common law. "Offices of profit" in England were offices to which a salary attached and in which the holder had a proprietary interest. As such, these offices were heritable, could be executed through hired deputies, and, in some cases, sold. *See* J.J.S. Wharton, *Wharton's Law Lexicon* 712 (14th ed. 1938) (defining "an office or place of profit under the Crown" as "an office held direct from the crown which nominally carries a salary"); Giles Jacob, *A New Law Dictionary*, tit. Office (9th ed. 1772) (describing an "office[] of profit" as a type of "office" that has "fee or profit appurtenant to it," and explaining that "an assise lay at Common law for an . . . office of profit, [but] for an office of charge and no profit, an assise does not lie"); *see also* 2 William Blackstone, *Commentaries* \*36 (describing "offices" as "incorporeal hereditaments"); 1 William Holdsworth, *A History of English Law* 248 (7th ed. 1956) (noting the introduction of the proprietary concept of offices into the colonies).

"Offices of trust," by contrast, were offices that, because they required "the exercise of discretion, judgment, experience and skill," *Law of Public Offices* § 16, were not heritable and could not be deputized or sold. *See* 2 Stewart Rapalje & Robert L. Lawrence, *A Dictionary of American and English Law* 895 (1883) ("Public offices are either offices of trust, which cannot be performed by deputy . . . , or ministerial offices, which may be performed by deputy."); 2 T. Cun-

ningham, *A New and Complete Law Dictionary*, tit. Office (London, 2d ed. 1771) (discussing the prohibition against selling "offices of trust"); 2 Blackstone, *Commentaries* at *36–37 (explaining that an "office[] of public trust cannot be granted for a term of years," presumably because it might be inherited during the term by someone incompetent to perform it, "but ministerial offices may be so granted; for those may be executed by deputy" should the holder be incompetent to perform it). The English tradition of heritable offices that could be sold or executed entirely by hired deputies was rejected in this country after the Revolution. *See, e.g.*, Vt. Const. of 1777, ch. II, § 33, *reprinted in* 6 Francis Newton Thorpe, *The Federal and State Constitutions, Colonial Charters, and Other Organic Laws* 3747 (1909; reprint 1993) ("[T]here can be no necessity for, nor use in, establishing offices of profit, the usual effect of which are dependence and servility, unbecoming freemen, in the possessor or expectants."). Yet, the phrase "of profit or trust"—which, given the English tradition, had greater significance at the time—was incorporated into the emoluments clause contained in the Articles of Confederation, *see* Articles of Confederation art. VI, 1 Stat. 5 (1778), and, by virtue thereof, was later incorporated into the Constitution's Emoluments Clause, among other laws.

In other words, as later American sources confirm, to the extent that the phrase "of Profit or Trust" adds to the meaning of the term "Office," it narrows it, with "Profit" referring to offices for which the officeholder is paid, and "Trust" to offices the duties of which are particularly important. *See Corliss*, 11 R.I. at 642 (concluding that a position was not an "office of profit" because the holder of the position received no compensation, but that it was an "office of trust" because the holder "was intrusted with a large supervisory and regulative control of the property"); *Town of Meredith v. Ladd*, 2 N.H. 517, 519 (1823) ("[T]he office of constable is an office of trust [because] many important duties are devolved upon it, bonds are executed for fidelity, and in some places the income from it is very considerable."); *Shepherd*, 1 Serg. & Rawle at 9 (the position held by a state commissioner was not an office "of profit" "because he did not receive a cent as commissioner"). *See also Law of Public Offices* §§ 13, 16 (defining an "Office of Profit" as "[a]n office to which salary, compensation or fees are attached," and an "Office of Trust" as "[a]n office whose duties and functions require the exercise of discretion, judgment, experience and skill"). *Cf. Doty v. State*, 6 Blakf. 529, 530 (Ind. 1843) (rejecting distinction between office of "trust" and office of "profit" as "merely verbal," noting that "[a]ll offices of profit are necessarily offices of trust; and must, therefore be included in those of the latter description").[4]

---

[4] The Constitution also references an "Office of honor," U.S. Const. art. I, § 3, cl. 7 ("Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States.")—a term that arguably includes offices that are not "of profit" or "of trust." We do not definitively resolve the meaning of this term. We note, however, that it historically has been understood to encompass offices to which no fees,

As mentioned, however, we need not definitively resolve the meaning of the phrase "of Profit or Trust," because a position is not an "Office of Profit or Trust under [the United States]" if it is not, at the least, an "Office . . . under [the United States]." And, as we shall explain below, a purely advisory position is not an "Office . . . under [the United States]."

### B.

Although we do not here attempt to define comprehensively the meaning of an "Office under the United States," it is clear that a purely advisory position does not qualify. This conclusion follows from the Executive Branch's historical and longstanding understanding of that phrase, confirmed by an 1898 report of a Judiciary Committee of the House of Representatives. And it is also confirmed by the uncontradicted weight of judicial authority. Accordingly, we conclude that a purely advisory position is not an "office" and therefore not an "Office of Profit or Trust under [the United States]."

The Executive Branch has long been of the view that a purely advisory position is not a public "office." This view has been expressed most clearly in opinions from this Office addressing the meaning of the Ineligibility and Incompatibility Clauses of the Constitution. The Ineligibility Clause provides:

> No Senator or Representative shall, during the Time for which he was elected, be appointed to *any civil Office under the Authority of the United States*, which shall have been created, or the Emoluments whereof shall have been encreased during such time.

U.S. Const. art. I, § 6, cl. 2 (emphasis added). The Incompatibility Clause provides:

> [N]o Person holding *any Office under the United States*, shall be a Member of either House during his Continuance in Office.

---

profits, or salary attach, *see Law of Public Offices* § 15 (an "honorary office" is "an office to which no compensation attaches"); *State ex rel. Clark v. Stanley*, 66 N.C. 59, 63 (1872) ("Where no salary or fees are annexed to the office, it is a naked office—honorary,—and is supposed to be accepted, merely for the public good."); *Dickson v. People ex rel. Brown*, 17 Ill. 191, 193–95 (1855) (holding that the director of a state "institution for the education of the deaf and dumb," a position for which "[t]here are no fees, perquisites, profits or salary," occupied an "office of honor"), and that the Attorney General has interpreted the statutory phrase "office of honor or profit" as synonymous with an "officer of the United States" under the Appointments Clause, *see Oath of Clerks in the Executive Departments*, 12 Op. Att'y Gen. 521, 521–22 (1868) (interpreting the phrase "office of honor or profit" in the Act of July 2, 1862, ch. 128, 12 Stat. 502, to include only those who "are within the legal designation of officers" as defined by the Supreme Court's Appointments Clause cases).

*Id*. (emphasis added).[5] Whether referring to the need to exercise "some portion of the sovereign functions of Government," or the need to exercise "significant authority pursuant to the laws of the United States," we have consistently concluded that a purely advisory position is neither a "civil Office under the Authority of the United States" nor an "Office under the United States," because it is not an "office" at all. To be an "office," a position must at least involve some exercise of governmental authority, and an advisory position does not.

In 1989, for example, then Assistant Attorney General Barr concluded that an advisory commission that "perform[s] only advisory or ceremonial functions" is not an "office" within the meaning of the Incompatibility and Ineligibility Clauses because members of such commissions do not "exercis[e] significant authority pursuant to the laws of the United States." *Common Legislative Encroachments on Executive Branch Authority*, 13 Op. O.L.C. 248, 249 & n.2 (1989). Likewise, in 1969, then Assistant Attorney General Rehnquist concluded that the Staff Assistant to the President did not hold a civil office within the meaning of the Ineligibility Clause, observing that the term "office" meant

---

[5] Notably, the Emoluments Clause and the Incompatibility and Ineligibility Clauses share a common purpose—the prevention of public corruption. *See, e.g.*, 3 *Records* at 327 (statement of Gov. Randolph) (The Emoluments Clause "is provided to prevent corruption."); 3 Story, *Commentaries* §§ 1345–46 (The Emoluments Clause "is founded in a just jealousy of foreign influence of every sort."); 1 *Tucker's Blackstone* at 295–96 & n.* (explaining that the Emoluments Clause is rooted in the recognition that "[c]orruption is too subtle a poison to be approached, without injury"); 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 370 (Jonathan Elliot ed., 2d. ed. 1836) ("*Elliot's Debates*") (Madison, June 14, 1788) (The Ineligibility Clause "guards against abuse by taking away the inducement to create new offices, or increase the emolument of old offices."); 2 Story, *Commentaries* § 864 ("The reasons for excluding persons from offices, who have been concerned in creating them, or increasing their emoluments, are to take away, as far as possible, any improper bias in the vote of the representative, and to secure to the constituents some solemn pledge of disinterestedness."); 2 *Elliot's Debates* at 475 (James Wilson, Penn. Ratifying Convention, Dec. 4, 1787) (the Incompatibility Clause seeks to prevent corruption by ensuring that "the mere acceptance of an office, as a bribe, effectually destroys the end for which it was offered"); *id*. at 484 ("The great source of corruption, in [England], is, that persons may hold offices under the crown, and seats in the legislature, at the same time."); Steven G. Calabresi & Joan L. Larsen, *One Person, One Office: Separation of Powers or Personnel?*, 79 Cornell L. Rev. 1045, 1077 (1994) ("The Incompatibility Clause was motivated by worries about British-style corruption. The Framers did not perceive it as having much to do with the separation of powers or with Presidential independence."); *id*. at 1051 ("Interestingly, the [Incompatibility] Principle seems to have been grounded less in separation-of-powers theory than in the Framers' vivid memory of the British Kings' practice of 'bribing' Members of Parliament [] and judges with joint appointments to lucrative executive posts. This practice was repeated in the colonies, which, after independence, enacted strict constitutional bans on plural office holding. . . . [The Incompatibility Clause was] intended [to] function as a constitutional ethics rule . . . [but had the] wholly unappreciated and unintended consequence of foreclosing 'parliamentary' government in this country by making the President's Cabinet and Administration much more independent of Congress."). *Compare Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 157–58 (1982) (declining to read the Emoluments Clause *in pari materia* with the Appointments Clause primarily because the two clauses serve different purposes, with the former being an anti-corruption measure and the latter grounded in separation of power principles).

> the right, authority, and duty, created and conferred by law, by which for a given period, either fixed by law or enduring at the pleasure of the creating power, *an individual is invested with some portion of the sovereign functions of the Government* to be exercised by him for the benefit of the public.

Memorandum for Lamar Alexander, Staff Assistant to the President, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel at 2 (Dec. 9, 1969) (quoting 1 Asher C. Hinds, *Hinds' Precedents of the House of Representatives* 604 (1907)) (emphasis added). *See also Appointments to the Commission on the Bicentennial of the Constitution*, 8 Op. O.L.C. 200, 207 & n.2 (1984) (noting that congressmen could serve on presidential commission if "purely executive functions" were separated from "advisory functions" and congressional participation was limited to the advisory functions); Memorandum for Robert A. McConnell, Assistant Attorney General, Office of Legislative Affairs, from Robert B. Shanks, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Draft Bill to Establish a Select Commission on Drug Interdiction and Enforcement* at 4 (Aug. 23, 1983) ("The Commission's duties appear to be 'investigative and informative' in nature. Thus, . . . the holding of membership on the Commission by Members of the Committees on the Judiciary[] raise[s] no constitutional issue under the . . . Incompatibility Clause[]."); *Proposed Commission on Deregulation of International Ocean Shipping*, 7 Op. O.L.C. 202, 203 (1983) (concluding that appointment of members of Congress to a commission on deregulation of international ocean shipping would "not implicate the Incompatibility Clause of the Constitution," because the commission was "purely advisory": it would "make a comprehensive study of particular issues . . . and submit a report making recommendations to Congress and the President" but would "possess no enforcement authority or power to bind the Government"); Memorandum for Sanford M. Litvack, Assistant Attorney General, Antitrust Division, from Larry L. Simms, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Report to the President by the White House Commission on Small Business* at 2–3 (July 1, 1980) ("If the recommended Board is to exercise any significant Executive authority pursuant to the laws of the United States, it could not include . . . members of Congress . . . among its membership [under the Incompatibility Clause]."); *Office—Compensation*, 22 Op. Att'y Gen. 184, 187 (1898) ("The legal definitions of a public office have been many and various. The idea seems to prevail that it is an employment to exercise some delegated part of the sovereign power; and the Supreme Court appears to attach importance to the ideas of 'tenure, duration, emolument, and duties,' and suggests that the last should be continuing or permanent, not occasional or temporary."); *Congressmen and Senators—Eligibility to Civil Offices*, 26 Op. Att'y Gen. 457, 458–59 (1907) (members of Congress could serve on the Board of Managers of the Soldiers' Home because its members are selected by Congress and are not "Federal officers").

This view, moreover, is identical to that espoused by the Judiciary Committee of the House of Representatives in 1898. There, the House of Representatives passed a resolution directing the Judiciary Committee to report whether any member of the House has "accepted any office under the United States" and whether "the acceptance of such office under the United States has vacated the seat of the Member" pursuant to the Incompatibility Clause. The Judiciary Committee concluded that membership on "a commission created by law to investigate and report, but having no legislative, judicial, or executive powers," did not constitute an office within the meaning of the Incompatibility Clause. 1 Asher C. Hinds, *Hinds' Precedents of the House of Representatives* 604 (1907). The committee's report explained that an "office":

> involves necessarily the power to (1) legislate, or (2) execute law, or (3) hear and determine judicially questions submitted.
>
> Therefore, mere power to investigate some particular subject and report thereon, or to negotiate a treaty of peace, or on some commercial subject, and report without power to make binding on the Government, does not constitute a person an officer.
>
> 'It (public office) implies a delegation of a portion of the sovereign power to, and the possession of it by, the person filling the office, and the exercise of such power within legal limits constitutes the correct discharge of the duties of such office.'
>
> . . . .
>
> The duties of the commissioners appointed under the statutes (to which attention will be called[)], are not continuing or permanent; they have no place of business for the public use, or even for their own use; they give no bond and take no oath. In fact, they are mere agents appointed by direction of Congress for the purpose of gathering information and making recommendations for its use if the Congress sees fit to avail itself of the labors of the commission. The commissioners appointed under these statutes or resolutions can not be compelled to attend or act, and in the broadest sense they are mere agents of the Congress. These commissioners are not to execute any standing laws which are the rules of action and the guardians of rights, nor have they the right or power to make any such law, nor can they interpret or enforce any existing law.

*Id*. at 607–08.

Finally, the uncontradicted weight of judicial authority confirms that a purely advisory position is not a public "office." These authorities list several factors

relevant to determining whether a position amounts to a public "office," including whether it involves the delegation of sovereign functions, whether it is created by law or by contract, whether its occupant is required to take an oath, whether a salary or fee is attached, whether its duties are continuing and permanent, the tenure of its occupant, and the method of appointment. *See, e.g.*, *Law of Public Offices* §§ 1–9 (describing factors and citing cases); *Wise v. Withers*, 7 U.S. (3 Cranch.) 331, 336 (1806); *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823); *In re Attorney Oaths*, 20 Johns. (N.Y.) 492, 492 (1823); *Bunn v. People ex rel. Laflin*, 45 Ill. 397, 405 (1867). But they likewise make clear that the sine qua non of a public "office" is the exercise of some portion of delegated sovereign authority. *See Law of Public Offices* §§ 1, 4.

One case, arising out of New York, bears particular emphasis, because it most directly addresses the question at hand. In *Kingston Assocs., Inc. v. LaGuardia*, 156 Misc. 116, 121 (N.Y. Sup. Ct. 1935), the court held that a purely advisory position was not a "civil office of honor, trust, or emolument under the Government of the United States" within the meaning of the Greater New York Charter, which prohibited certain city officials from accepting such an office. At issue was whether Mayor Fiorello LaGuardia had forfeited the mayoralty by accepting a position on the federal Advisory Committee on Allotments. The court described several factors relevant to the question whether the federal advisory position was an "office" within the meaning of the charter, including whether the occupant was required to take an oath, whether the position involved a salary, and the duration of the position. *Id*. at 120–21. Dispositive, however, was the absence of any delegated sovereign authority: "There is . . . one indispensable attribute of public office, namely, the right to exercise some portion of the sovereign power." *Id*. at 121. "Clearly," the court explained, "the members of the Advisory Committee on Allotments possess none of the powers of the sovereign," because "[t]he right to recommend amounts to nothing more than the right to advise . . . . [and] [t]he making of a recommendation does not constitute the exercise of an executive function." *Id*. at 123. The court thus held that the advisory committee position was not an "office" at all and hence that Mayor LaGuardia had not forfeited the mayoralty.

Innumerable other authorities likewise make clear that an indispensable element of a public "office" is the exercise of some portion of delegated sovereign authority, which, as *Kingston* and other authorities (discussed below) make clear, is absent with respect to a purely advisory position. As early as 1822, for example, the Maine Supreme Court held that an "agent[] for the preservation of timber on the public lands" did not occupy an "office of profit under th[e] State" because it was not an "office" of any sort, explaining:

> We apprehend that the term 'office' implies a delegation of a portion
> of the sovereign power to, and possession of it by the person filling
> the office;—and the exercise of such power within legal limits, con-

stitutes the correct discharge of the duties of such office. The power thus delegated and possessed, may be a portion belonging sometimes to one of the three great departments, and sometimes to another; still it is a legal power, which may be rightfully exercised, and in its effects it will bind the rights of others.

*Opinion of the Justices*, 3 Greenl. (Me.) 481, 482 (1822). A leading late-19th century treatise on public offices is to like effect, defining an "office" as:

the right, authority and duty, created and conferred by law, by which for a given period, either fixed by law or enduring at the pleasure of the creating power, an individual is invested with some portion of the sovereign functions of government, to be exercised by him for the benefit of the public. The individual so invested is a public officer. . . . *The most important characteristic which distinguishes an office from an employment or contract is that the creation and conferring of an office involves a delegation to the individual of some of the sovereign functions of government*, to be exercised by him for the benefit of the public.

*Law of Public Offices* §§ 1, 4 (emphasis added); *see also id*. § 4 ("Unless the powers conferred are of this nature[—involving the delegation of some sovereign function—]the individual is not a public officer."). And other authorities supporting this proposition are numerous and uniform.[6] Indeed, although not every

---

[6] *See, e.g.*, *Sheboygan Co. v. Parker*, 70 U.S. 93, 96 (1865) (individuals appointed by county as special agents for issuing bonds were not "county officers" because "[t]hey do not exercise any of the political functions of county officers, such as levying taxes, &c.," and "[t]hey do not exercise 'continuously, and as part of the regular and permanent administration of the government, any important public powers, trusts, or duties'"); *Hall v. Wisconsin*, 103 U.S. 5, 9 (1880) (commissioner appointed by county to make a scientific survey did not hold a public office, noting that under state law, the term "civil officer" "embraces only those officers in whom a portion of the sovereignty is vested, or to whom the enforcement of municipal regulations or the control of the general interests of society is confided"); *Byrne's Adm'rs v. Stewart's Adm'rs*, 3 S.C. Eq. (Des.) 466, 478 (1812) (the "office of solicitor" is not a public office because "he does not possess any portion of the public authority"); *Commonwealth ex rel. Bache v. Binns*, 17 Serg. & Rawle 219, 244 (Pa. 1828) (opinion of Tod, J.) (printer of congressional reports does not hold an "office . . . of profit or trust, under the government of the United States," noting that an "office" requires "a delegation of a portion of the sovereign power"); *In re J.L. Dorsey*, 7 Port. 293 373 (Ala. 1838) (opinion of Ormond, J.) (the term "office" refers "to those who exercise an office or place of honor or profit under the State government, and by authority derived from it"); Bruce Wyman, *The Principles of the Administrative Law Governing the Relations of Public Officers* 163 (1903) ("A public office . . . is the right, authority and duty conferred by law . . . [wherein] an individual is invested with some portion of the sovereign functions of the government to be exercised by him for the benefit of the public . . . . It finds its source and limitation in some act of expression of governmental power."); James L. High, *A Treatise on Extraordinary Legal Remedies* 581 (3d ed. 1896) ("An office, such as to properly come within the legitimate scope of an information in the nature of a quo warranto, may be defined as a public position, to which a portion of the sovereignty of the country, either legislative, executive or judicial, attaches for

reported decision explicitly ties a public "office" to the exercise of some portion of sovereign authority, we have not found a single case in which an individual was deemed to hold such an "office," including one "of profit or trust," where he was invested with no delegated sovereign authority, significant or otherwise.[7]

---

the time being, and which is exercised for the benefit of the public."); *United States ex rel. Boyd v. Lockwood*, 1 Pin. 359, 363 (Wisc. Terr. 1843) ("An office is where, for the time being, a portion of the sovereignty, legislative, executive or judicial, attaches, to be exercised for the public benefit. That the office of judge of probate of Crawford county is an office within this definition, there can be no question."); *Bunn v. People ex rel. Laflin*, 45 Ill. 397, 406 (1867) (commissioners supervising construction of a statehouse did not hold an "office" because they had not "the slightest connection with the exercise of any portion of the executive power, or of any departmental powers"); *Eliason v. Coleman*, 86 N.C. 235, 239–40 (1882) (chief engineer of the Western North Carolina Railroad did not hold an "office," defined as "'a public position to which a portion of the sovereignty of the country, either legislative, executive or judicial, attaches for the time being, and which is exercised for the benefit of the public'"); *Commonwealth v. Swasey*, 133 Mass. 538, 541 (1882) (the city physician holds a "public office" because he "is by virtue of his office a member of the board of health, which is invested with important powers to be exercised for the safety and health of the people"); *State v. Kennon*, 7 Ohio St. 546, 562–63 (1857) (panel authorized to appoint, supervise and remove other government officials occupied "offices" because they were charged with "exercis[ing] continuously, and as part of the regular and permanent administration of the government, important public powers, trusts, and duties"); *Shelby v. Alcorn*, 36 Miss. 273, 292 (1858) (a "levee commissioner" is a "civil office of profit" because "[c]lothed with a portion of the power vested in [the executive] department, the commissioner, in the discharge of his proper functions, exercises as clearly sovereign power as the governor, or a sheriff, or any other executive officer, when acting within his appropriate sphere").

[7] In some such cases, the individual deemed to hold an "office" clearly exercised sovereign authority. *See, e.g.*, *Marbury v. Madison*, 5 U.S. (1 Cranch.) 137, 164 (1803) (describing the position of justice of the peace for the District of Columbia, which carried with it substantial governmental authority, as among the "offices of trust, of honor or of profit"); *United States v. Maurice*, 26 F. Cas. 1211, 1214 (C.C.D. Va. 1823) (No. 15,747) (an "agent of fortifications," whose duties included "disburs[ing] money placed in their hands" in accordance with "the orders of the engineer department," "provid[ing] materials and workmen deemed necessary for the fortifications," and "pay[ing] the labourers em–ployed," occupied an "office" and was an "Officer of the United States"); *Wise v. Withers*, 7 U.S. (3 Cranch.) 331, 336 (1806) (a "justice of the peace" for the District of Columbia was an "officer under the government of the United States" within the meaning of a statute exempting such officers from militia duty); *In re Corliss*, 11 R.I. 638, 640–41 (1876) (holding that commissioners of the United States Centennial Commission held an "Office of Trust" under U.S. Const. art. II, § 1, cl. 2, where their statutorily created duties were to "'prepare and superintend the execution of a plan for holding the [centennial] exhibition'"; work with a finance board "'to raise and disburse funds'"; make regulations setting entrance and admission or otherwise "'affecting the rights privileges, or interests of the exhibitors, or of the public'"; and "'have power to control, change, or revoke all . . . grants'" "'conferring rights and privileges'" relating to the exhibition or its grounds and buildings); *United States v. Hartwell*, 73 U.S. 385, 392–93 (1867) (holding that a "clerk" in the office of the "assistant treasurer of the United States . . . at Boston" was a "public officer[]" within the meaning of a criminal embezzlement statute that applied to, among others, "'[a]ll officers and other persons charged . . . with the safe-keeping, transfer and disbursement of the public money,'" where the clerk was "subject to the duty, to keep safely the public moneys of the United States"); *Town of Meredith v. Ladd*, 2 N.H. 517, 519 (1823) ("[H]ere the office of constable is an office of trust . . . because both ex-officio and by precepts, a constable is empowered to arrest criminals under certain circumstances and by execution to seize either the person or property of small debtors."). In others, an individual who apparently did exercise some sovereign authority was nonetheless deemed not to hold a public "office" because he did not satisfy other elements of an "office"; for example, his duties were not continuing and permanent. *See, e.g.*, *United States v. Germaine*, 99 U.S. 508, 512 (1879) (a "civil surgeon" was not an "officer of

In light of the overwhelming authority discussed above, we conclude that a purely advisory position is not an "Office under the United States," and hence not an "Office of Profit or Trust under [the United States]" within the meaning of the Emoluments Clause.

## C.

This conclusion is generally consistent with the past opinions of this office. First, this office's more recent opinions have concluded that membership on certain advisory committees did not amount to an "Office of Profit or Trust." *See Advisory Committee on International Economic Policy*, 20 Op. O.L.C. 123, 123 (1996) (members of Advisory Committee on International Economic Policy did not hold an "Office of Profit or Trust"); *Application of the Emoluments Clause to "Representative" Members of Advisory Committees*, 21 Op. O.L.C. 176 (1997) ("'representative' members" of an advisory committee did not hold an "Office of Profit or Trust"). These opinions "reject[ed] the sweeping and unqualified view," *Advisory Committee on International Economic Policy*, 20 Op. O.L.C. at 123, expressed in dictum five years earlier, that all federal advisory committee positions were covered by the Emoluments Clause, *see Applicability of 18 U.S.C. § 219 to Members of Federal Advisory Committees*, 15 Op. O.L.C. 65, 68 (1991). Although a 1993 opinion concluded that members of an advisory committee did hold an "Office of Profit or Trust," that entity, while nominally called an "advisory committee," was, in fact, a "Federal agency established by statute" with certain statutorily assigned powers and functions. *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 117, 123 n.10 (1993).

Second, the great majority of other opinions issued by this office, mostly prior to 1982, equated an "Office of Profit or Trust" under the Emoluments Clause with

the United States" within the meaning of a federal extortion statute because his duties were not "continuing and permanent," but "occasional or temporary," and noting that "[h]e is but an agent of the [C]ommissioner [of Pensions], appointed by him, and removable by him at his pleasure, to procure information needed to aid in the performance of his own official duties"); *Auffmordt v. Hedden*, 137 U.S. 310, 326–27 (1890) (a "merchant appraiser" selected by a customs collector to conduct an appraisal of goods is not an "officer of the United States" within the meaning of the Appointments Clause because "his position is without tenure, duration, continuing emolument, or continuous duties, and he acts only occasionally and temporarily"); *Ex Parte William Pool*, 2 Va. Cas. 276, 280 (1821) (holding that a state justice of the peace with the power to arrest was not an "officer" because his duties were not regular and permanent), *but see id.* at 290–91 (dissenting opinion) (arguing that the authority of justices of the peace "to grant warrants of arrest against persons accused of crimes or offences against the Laws of the United States, to examine, bail, or commit the accused, compel the attendance of witnesses, recognize them to appear to give evidence under pain of imprisonment," made them officers under the Appointments Clause of the Constitution); *Shepherd v. Commonwealth*, 1 Serg. & Rawle 1, 8–9 (Pa. 1814) (holding that a commissioner charged with issuing binding decisions regarding state compensation for claimants to certain lands did not hold an office because the position was special or temporary). Such cases stand for the uncontroversial proposition that while some exercise of sovereign authority is a necessary element of an "office," it is not of itself a sufficient one.

an "officer of the United States" under the Appointments Clause.[8] As the Supreme Court made clear in *Buckley v. Valeo*, 424 U.S. 1 (1976), however, an "officer of the United States" exercises "*significant authority* pursuant to the laws of the United States," *id*. at 126 (emphasis added). A position that carried with it no governmental authority (significant or otherwise) would not be an office for purposes of the Appointments Clause, and therefore, under the analysis of these opinions, would not be an office under the Emoluments Clause either. Accordingly, our conclusion is consistent with these opinions as well.

Finally, a small handful of this Office's opinions issued after 1982, do create some confusion as to what amounts to an "Office of Profit or Trust." Much of this confusion stems from a 1982 opinion, in which we abandoned this Office's longstanding position that an "Office of Profit or Trust" under the Emoluments Clause was synonymous with an "officer of the United States" under the Appointments Clause, relying primarily upon the differing purposes of the two clauses. *See Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 157 (1982) (noting that the Appointments Clause "finds its roots in separation of powers principles" whereas "[t]he Emoluments Clause, on the other hand, is designed 'to exclude corruption and foreign influence'").[9] In the 1982 opinion and on three subsequent occasions

---

[8] *See, e.g.*, Memorandum for Laurence H. Silberman, Deputy Attorney General, from Mary C. Lawton, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Ability of Intermittent Consultant to United States to Hold Similar Position under Foreign Government* at 4 (Aug. 7, 1974) (concluding that, because a part-time consultant "would not be an officer in the constitutional sense," "[t]he prohibitions of [the Emoluments Clause] would not apply to him"); Memorandum for Peter Strauss, General Counsel, Nuclear Regulatory Commission, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel at 2 n.1 (July 26, 1976) (reading "the term 'Office' as it appears in [the Emoluments Clause] . . . in pari materia with the term 'Officers' as it appears in Art. II, § 2 [the Appointments Clause]"); Memorandum for Dudley H. Chapman, Associate Counsel to the President, from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, *Re: Appointment of a Foreign National to the National Voluntary Service Advisory Council* (May 10, 1974); *Offices of Trust*, 15 Op. Att'y Gen. 187 (1877); *Foreign Diplomatic Commission*, 13 Op. Att'y Gen. 537 (1871); *Delivery of an Insignia from the German Emperor to a Clerk in the Post-Office Department*, 27 Op. Att'y Gen. 219 (1909); *Field Assistant on the Geological Survey—Acceptance of an Order from the King of Sweden*, 28 Op. Att'y Gen. 598 (1911); Memorandum for S.A. Andretta, Administrative Assistant Attorney General, from J. Lee Rankin, Assistant Attorney General, Office of Legal Counsel, *Re: Payment of Compensation to Individual in Receipt of Compensation from a Foreign Government* (Oct. 4, 1954). *See also Applicability of Emoluments Clause to Proposed Service of Government Employee on Commission of International Historians*, 11 Op. O.L.C. 89, 90 & n.2 (1987) (relying upon pre-1982 opinion equating "Office of Profit or Trust" with "Officer of the United States" under the Appointments Clause) (citing *Delivery of an Insignia from the German Emperor to a Clerk in the Post-Office Department*, 27 Op. Att'y Gen. 219 (1909)).

[9] The 1982 opinion also stated that the "language . . . of the two provisions [is] significantly different" and suggested that all federal employees held an "Office of Profit or Trust" under the Emoluments Clause. *Id*. at 157–58. That opinion, however, undertook no analysis of the text of either the Appointments Clause or the Emoluments Clause, and we have since retreated from the suggestion that all federal employees held an "Office of Profit or Trust." *See, e.g.*, *Advisory Committee on International Economic Policy*, 20 Op. O.L.C. 123 (1996) (some special government employees do not hold an

we suggested that individuals with access to sensitive, national security-related information held "Office[s] of Profit or Trust" under the Emoluments Clause, without further analyzing the extent of governmental authority exercised by these federal employees.[10] Because these opinions did not analyze the extent of the governmental authority exercised by these federal employees, they could be taken to suggest that such analysis was not necessary to determining whether or not these individuals held an "Office of Profit or Trust."

This is not, however, how we understand these opinions. Rather, it is at least arguable that the authority to control and safeguard classified information does amount to the exercise of governmental authority sufficient to render employment with the federal government a public "office." Such a conclusion, for example, finds some support in the Supreme Court's *Hartwell* decision, wherein the Court held that a clerk in the Treasury Department "charged with the safe-keeping of public money" was a "public officer" within the meaning of a federal anti-embezzlement statute, *Hartwell*, 73 U.S. at 393, noting that he "was appointed by the head of a department within the meaning of [the Appointments Clause]," *id*. at 393–94 & n.9. *See also id*. at 394 (describing the clerk as a "subordinate of-ficer[]"). By analogy, it could be argued that a federal government employee charged with safeguarding sensitive national security-related information would likewise be a public officer charged with the exercise of some governmental authority. *See, e.g.*, Exec. Order No. 12958, §§ 4.1–4.3 (procedures for safeguard-ing classified information) (as amended); 32 C.F.R. § 2003.20 (2003) (all person-

---

"Office of Profit or Trust"); *Application of the Emoluments Clause to "Representative" Members of Advisory Committees*, 21 Op. O.L.C. 176 (1997) (same); *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 99 (1986) (noting that although "this Office expressed the view in 1982 that the Emoluments Clause applies to all government employees, . . . the clause need not be read so broadly to resolve the matter at hand").

[10] *See Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decora-tions Act*, 6 Op. O.L.C. at 157–58 (Nuclear Regulatory Commission employee "involve[d] [in] the [NRC's] assessment of operating [nuclear] reactors," "a field where . . . secrecy is pervasive"); *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 99 (1986) (part-time Nuclear Regulatory Commission employee who is "furnish[ed] [by the NRC] with various materials and documentation," whose position "requires a security clearance," and who "may develop or have access to sensitive and important, perhaps classified, information"); Letter for James A. Fitzgerald, Assistant General Counsel, Nuclear Regulatory Commission, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel at 5 (June 3, 1986) (among other things, fact that employee has access to classified information indicates that he holds an office of profit or trust); Memorandum for James H. Thessin, Assistant Legal Adviser for Management, Department of State, from John O. McGinnis, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Application of the Emoluments Clause to a Civilian Aide to the Secretary of the Army* at 3 (Aug. 29, 1988) (civilian aide to the Secretary of the Army has "access to classified information, and receive[s] a security orientation concerning . . . responsibilities in receiving, handling, and protecting classified information") (quotations omitted).

Editor's Note: The June 3, 1986 letter for the Assistant General Counsel of the Nuclear Regulatory Commission is the unpublished version of *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96 (1986), also cited in this footnote.

nel granted access to classified information must sign nondisclosure agreement acknowledging that "all classified information . . . [subject to] th[e] Agreement is now and will remain the property of . . . the United States Government"); *cf. Snepp v. United States*, 444 U.S. 507, 510, 512 (1980) (a CIA agent's access to sensitive information imposed upon him a "fiduciary obligation" to safeguard that information, noting that the unauthorized disclosure of such information "impairs the CIA's ability to perform its statutory duties"). In this regard, it is noteworthy that our opinion concluding that membership on the Advisory Committee on International Economic Policy was not an "Office of Profit or Trust" expressly relied on the fact that the members "[did] not have access to classified information." *Advisory Committee on International Policy*, 20 Op. O.L.C. at 123. In the end, however, we need not definitively resolve whether these four opinions reached the correct result, for as we have explained, a member of the President's Bioethics Council does not have access to classified information and does not otherwise exercise any governmental authority.

## III.

Accordingly, we conclude that membership on the President's Bioethics Council, a purely advisory position without access to classified information, is not an "Office of Profit or Trust under [the United States]" within the meaning of the Emoluments Clause.

NOEL J. FRANCISCO
*Deputy Assistant Attorney General*
*Office of Legal Counsel*